UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
────────────────────────────────────x

HONG MAI,

                          Plaintiff,                          **MEMORANDUM**
                                                             **& ORDER**
          − against −
                                                             15−CV−7448 (PKC)
COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

────────────────────────────────────x

PAMELA K. CHEN, United States District Judge:

     Plaintiff Hong Mai ("Plaintiff"), appearing *pro se*, brings this action under 42 U.S.C. §§

405(g) and 1383(c)(3), seeking judicial review of the Social Security Administration's ("SSA")

denial of her claim for Supplemental Security Income ("SSI"). The parties have cross-moved for

judgment on the pleadings. For the reasons set forth below, the Court GRANTS the

Commissioner's motion and DENIES Plaintiff's motion. Accordingly, the Commissioner's

decision is affirmed.

<u>**BACKGROUND**</u>

**I.      Procedural History**

     Plaintiff filed an application for SSI on March 27, 2002, alleging disability beginning on

January 1, 1996, due to heart problems, tuberculosis, thyroid disease, diabetes, high cholesterol,

breathing difficulties, and skin problems. (Tr.[1] 97, 101.) On June 21, 2002, the SSA denied

Plaintiff's claim. (Tr. 86−87.) On June 25, 2002, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"). (Tr. 89.) That hearing initially was scheduled for April 5,

─────────────────

     [1] The abbreviation "Tr." refers to citations to the certified administrative record (1-1276).

2004, but Plaintiff failed to appear. (Tr. 95.) After the hearing was rescheduled, Plaintiff appeared *pro se* before ALJ Sol A. Wieselthier on August 23, 2004. (Tr. 31, 34.) In a decision dated December 27, 2005, ALJ Wieselthier denied Plaintiff's claims. (Tr. 12−14.) ALJ Wieselthier's decision became final on April 19, 2006, when the Appeals Council denied Plaintiff's request for review. (Tr. 5−7.) Plaintiff appealed ALJ Wieselthier's decision to this Court. (Tr. 584−90.) In an opinion dated July 10, 2007, the Honorable Allyne R. Ross remanded the case to the Commissioner for further development and re-evaluation of the record. (Tr. 587.) The Appeals Council then vacated ALJ Wieselthier's decision and remanded the case to ALJ Wieselthier, who held another hearing on April 8, 2008. (Tr. 593, 675.) Plaintiff again appeared *pro se* at the hearing before ALJ Wieselthier. (Tr. 677−78.)

On November 7, 2008, the ALJ Wieselthier again found that Plaintiff was not disabled. (Tr. 560−69.) On November 27, 2008, Plaintiff filed a notice of disagreement. (Tr. 556.) The Appeals Council denied Plaintiff's request for review on January 11, 2010, thereby making ALJ Wieselthier's decision on remand final. (Tr. 553(A)−55.) Following the denial, Plaintiff again appealed the decision to this Court. (*See* Tr. 749.) On March 10, 2011, Plaintiff filed a second application for SSI, which was later consolidated with the March 27, 2002 application. (*See* Tr. 777.) On November 7, 2011, Judge Ross again remanded the case to the Commissioner. (Tr. 749−54.) The Appeals Council then remanded the case to ALJ Hazel C. Strauss. (Tr. 797−98.) On September 13, 2012, Plaintiff appeared at a hearing before ALJ Strauss. (Tr. 1207.) In a July 18, 2013 decision, ALJ Strauss found that the Plaintiff was not disabled. (Tr. 777−795.) On May 12, 2014, Plaintiff was determined to be a class member eligible for relief pursuant to *Padro v. Colvin*, No. 11-CV-1788 (CBA), 2013 WL 5719076 (E.D.N.Y. Oct. 1, 2013). (Tr. 722, 831−36.) Thus, her case was

reassigned to ALJ Michael Friedman,[2] who was not one of the ALJs identified in *Padro*. (Tr. 722, 739.) ALJ Friedman held a hearing on August 6, 2015, and on October 20, 2015, issued a decision finding that Plaintiff was not disabled. (Tr. 722−39.) The Appeals Council received the Plaintiff's request for appeal on December 2, 2015. (Tr. 715.) On March 30, 2016, the Appeals Council found Plaintiff's request for an appeal untimely because she did not send her objections within thirty days of ALJ Friedman's decision. (Tr. 715−16.) Accordingly, ALJ Friedman's October 20, 2015 decision is the final decision of the Commissioner that is subject to judicial review in the instant action, which Plaintiff commenced on December 15, 2015. (Dkt. No. 1.)

## II.    ADMINISTRATIVE RECORD

### A.    Medical Evidence

1.    Treating Physicians

a.    Bellevue Hospital Center Physicians (Before March 27, 2002)[3]

Beginning in 1995, Plaintiff was treated at Bellevue Hospital Center ("Bellevue") for a range of conditions including asthma, hypothyroidism,[4] cardiovascular disease, hepatitis,

---

[2] Unless otherwise indicated, references to the "ALJ" in these proceedings refer to ALJ Friedman.

[3] The Court has divided Plaintiff's medical treatment at Bellevue Hospital into two periods—before March 27, 2002 (the date on which Plaintiff's SSI application was filed) and after March 27, 2002—because the relevant time period for an application for SSI benefits is "the date the SSI application was filed, to . . . the date of the ALJ's decision." *Frye ex rel. A.O. v. Astrue*, 485 F. App'x. 484, 488 n. 2 (2d Cir. 2012) (summary order). Although the Court summarizes Plaintiff's pre-March 27, 2002 medical history, as discussed *infra*, the ALJ reviewing Plaintiff's application may discount or disregard the treatment and medical opinions rendered during this pre-application period.

[4] Hypothyroidism is a condition in which the thyroid does not produce enough of certain hormones. Untreated hypothyroidism can cause obesity, joint pain, infertility, and heart disease, among other health problems. *See Hypothyroidism*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/hypothyroidism/home/ovc-20155291 (last visited Sept. 18, 2017).

tuberculosis, non-insulin dependent diabetes mellitus (NIDDM),[5] peripheral neuropathy,[6] blepharitis,[7] hyperlipidemia,[8] and hyporeflexia.[9]  In November 1995, Plaintiff had a positive purified protein derivative (PPD)[10] test, which was treated for six months with isonicotinic acid hydrazide (INH).[11]  (Tr. 145.)  In December of 1995, Plaintiff, on referral from NENA Health Council, presented to the Bellevue Emergency Department with complaints of an enlarged thyroid. (Tr. 543−44.)  Dr. James Go performed a thyroid biopsy for which the results were consistent with a nodular goiter.[12]  (Tr. 541–542.)  In February 1996, Dr. Go opined that Plaintiff was able to "resume regular employment."  (Tr. 538.)  In June 1996, Plaintiff underwent a left thyroidectomy in China.  (Tr. 151−52, 519, 535.)

---

[5] NIDDM is the former designation for Type II diabetes.  *See Non−insulin Dependent Diabetes Mellitus (NIDDM)*, STEDMAN'S MEDICAL DICTIONARY 243400.

[6] Peripheral neuropathy is a result of damage to peripheral nerves that can cause weakness, numbness, and pain in hands, feet, and other parts of the body.  *See Peripheral Neuropathy*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/home/ovc-20204944 (last visited Sept. 18, 2017).

[7] Blepharitis is an inflammation of the eyelids.  *See Blepharitis*, STEDMAN'S MEDICAL DICTIONARY 106660.

[8] Hyperlipidemia occurs when elevated levels of lipids are in the blood plasma.  *See Hyperlipidemia*, STEDMAN'S MEDICAL DICTIONARY 424210.

[9] Hyporeflexia is a condition in which the reflexes are weakened.  *See Hyporeflexia*, STEDMAN'S MEDICAL DICTIONARY 430160.

[10] Purified protein derivative (PPD) skin test is a method used to diagnose silent (latent) tuberculosis infection.  *See PPD skin test*, U.S. NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/ency/article/003839.htm (last visited Sept. 18, 2017).

[11] Isonicotinic acid hydrazide is the "first-line and probably most commonly used antituberculosis drug." *See Isoniazid*, STEDMAN'S MEDICAL DICTIONARY 459320.

[12] A goiter is an enlargement of the thyroid gland that can cause difficulty swallowing and breathing.  *See Goiter*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/goiter/home/ovc-20264589 (last visited Sept. 18, 2017).

In September 1996, Plaintiff returned to Bellevue Emergency Department for flu treatment. (Tr. 519.) Radiology results from October 1996 revealed that Plaintiff's heart was within normal limits and her lungs were clear. (Tr. 461.) During an evaluation with Dr. Erkan[13] on October 28, 1996, Plaintiff related that she had a history of Hepatitis B and a heart problem. (Tr. 536.) Dr. Erkan noted that the "only lab abnormality is [high] glucose." (*Id.*) A lab report from November 18, 1996, showed that Plaintiff was positive for Hepatitis B surface antibody (anti-HBs).[14] (Tr. 484.) A thyroid ultrasound on November 19, 1996, indicated "no nodules . . . within the left thyroid lobe" and a "small hypoechoic right thyroid lobe nodule . . . not seen on prior study." (Tr. 462.)

On December 9, 1996, Dr. Tierney, from Bellevue's Chest Clinic, reported that Plaintiff had an unclear history of heart disease and her electrocardiogram ("ECG") showed a normal sinus rhythm. (Tr. 531.) Additionally, Dr. Tierney noted that testing revealed no evidence of pulmonary disease. (*Id.*) Further, Dr. Tierney reported that Plaintiff refused exercise testing, stating that "she was told in China 'not to exercise.'" (*Id.*) On January 21, 1997, Dr. Tierney wrote that Plaintiff was complaining of shortness of breath. (Tr. 529.) Six days prior, an echocardiogram ("Echo") revealed that Plaintiff had a normal left ventricular ejection fraction.[15] (*Id.*) On March 10, 1997,

---

[13] The Court does not indicate the first name of a physician or other individual, or the specialty of a physician or other medical professional, where that information is not apparent from the record.

[14] "The presence of [Hepatitis B surface antibodies] is generally interpreted as indicating recovery and immunity from HBV infection. Anti−HBs also develop in a person who has been successfully vaccinated against hepatitis B." *See Hepatitis B FAQs for Health Professionals* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/hepatitis/hbv/hbvfaq.htm (last visited Sept. 18, 2017).

[15] An ejection fraction refers to the "fraction of the blood contained in the ventricle at the end of diastole that is expelled during its contraction." *See Ejection Fraction*, STEDMAN'S MEDICAL DICTIONARY 352700.

Dr. Tierney noted that Plaintiff was administered a methacholine challenge[16] after complaining of shortness of breath.  (Tr. 497.)  Dr. Tierney reported that Plaintiff stated that she felt better after being administered the methacholine challenge.  (*Id.*)  Dr. Tierney reported that Plaintiff became "excited and agitated when [the doctor] attempted to explain the purpose of the methacholine to her."  (*Id.*)

On May 22, 1997, Dr. Rahman, who treated Plaintiff at Bellevue's Primary Care Clinic, examined Plaintiff and noted that Plaintiff had a normal Echo in January 1997 and was not believed to have cardiovascular disease.  (Tr. 465.)  He also noted that Plaintiff did not have Hepatitis B and was immune to it, and did not have asthma.  (*Id.*)  Dr. Rahman also noted that Plaintiff's lungs were clear.  (*Id.*)  On June 3, 1997, Dr. Rahman reported that Plaintiff refused an exercise stress test ("EST"),[17] and that it was extremely unlikely that Plaintiff had cardiovascular disease.  (Tr. 466.)  Dr. Rahman also wrote that Plaintiff did not have Hepatitis B.  (*Id.*)  Dr. Rahman also opined that if the endocrinology department wished to have Plaintiff undergo thyroid suppression therapy, they could do so slowly with a low dosage; Plaintiff was scheduled for a follow-up with the endocrinology department.  (*Id.*)  Clinical records from July 1997 indicate that Plaintiff refused exercise testing and became "very agitated and insisted that she had asthma."  (Tr. 459.)  Plaintiff was then prescribed Serevent,[18] though her methacholine challenge was negative.  (*Id.*)

---

[16] Methacholine is a potent bronchoconstrictor. A methacholine challenge test is typically performed when there is no clear clinical diagnosis of asthma.  *See Methacholine Challenge Test*, STEDMAN'S MEDICAL DICTIONARY 906580.

[17] Exercise stress testing is a standard procedure for assessing the effect of stress on cardiac function and identifying coronary artery disease.  *See Stress Test*, STEDMAN'S MEDICAL DICTIONARY 908470.

[18] "Serevent Diskus is a prescription medicine used to control symptoms of asthma and to prevent symptoms such as wheezing."  *Medication Guide: Serevent Diskus*, U.S. FOOD AND DRUG

From 1997 to June 2002, Plaintiff was primarily under the care of Dr. Christina Tan ("Dr. Tan") at Bellevue. In November 1997, Plaintiff was listed as an inpatient for a thyroid gland operation, which had a final diagnosis of a right nodular goiter, at No. 458 Hospital of the People's Liberation Army of China. (Tr. 153.) In a note for Dr. Tan on April 23, 1998, the examining physician at Bellevue reported that a head and neck exam was negative for a discrete palpable mass. (Tr. 453.) Plaintiff insisted on the presence of a mass and became very angry during the exam. (*Id.*) On May 8, 1998, Plaintiff reportedly presented to the primary care clinic with complaints of right upper quadrant pain stating, "My liver hurts—I want medicine for Hepatitis B." (Tr. 450.) The triage nurse instructed Plaintiff to try Tylenol for the pain. (*Id.*) An abdominal ultrasound conducted on July 1, 1998, revealed a "heterogeneous echogenic liver consistent with fatty infiltration or hepatocellular disease,"[19] which, according to the results, "demonstrate[d] no significant interval change when compared with [a] prior study [on April 1, 1997]." (Tr. 1149–50.) Additionally, the results indicated that there was "no evidence of cholelithiasis[20] or bile duct dilatation." (Tr. 1150.)

On August 20, 1998, Dr. Tan reported to the Immigration and Naturalization Service that Plaintiff had a "history of angina" and "no mental disability [or] impairment," (Tr. 146) and that Plaintiff had been permanently disabled since 1996 (Tr. 147). On October 1, 1998, Dr. Tan reported that a recent pulmonary function test ("PFT") from September 1998, revealed that

---

ADMINISTRATION, https://www.fda.gov/downloads/Drugs/DrugSafety/ucm089125.pdf (last visited Sept. 18, 2017).

[19] The prefix "hepat" refers to the liver. *See Hepat-*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/hepat- (last visited Sept. 28, 2017).

[20] Cholelithiasis is the presence of concretions in the gallbladder or bile ducts. *See Cholelithiasis*, STEDMAN'S MEDICAL DICTIONARY 170460.

Plaintiff did not have an obstructed airway. (Tr. 411.) In an evaluation form dated December 10, 1998, another physician reported that Plaintiff had clear lungs. (Tr. 409.) A triage nurse reported on January 8, 1999, that Plaintiff requested a change in prescription and complained of a painful growth in her right breast. (Tr. 407.) A bilateral mammogram, followed by a bilateral ultrasound in March 1999, showed no signs of malignancy. (Tr. 399, 401.) The bilateral ultrasound demonstrated no discrete cystic or solid lesion. (Tr. 399.) In February 1999, Dr. Tan noted that Plaintiff's pulmonary function was stable and that she should continue Serevent, as necessary, and Lipitor.[21] (Tr. 403.) In March 1999, Dr. Geraldine Tan reported that Plaintiff's thyroid was not enlarged and that her lungs were clear. (Tr. 303.)

During an emergency room visit on April 26, 1999, Plaintiff was diagnosed with contact dermatitis resulting from "overuse of Loprox."[22] (Tr. 391.) Plaintiff mentioned that she had suffered from the condition for about six months. (Tr. 390.) Dr. Tan reported that Plaintiff's pulmonary function was stable in June 1999. (Tr. 400.) In July 1999, Plaintiff had a normal ECG. (Tr. 244.) A note from Bellevue's Dermatology Department dated August 27, 1999, reported that Plaintiff's rash had improved. (Tr. 396.) On November 12, 1999, Plaintiff once again returned to the emergency room with complaints of itchiness and dermatitis. (Tr. 369−71.) She was prescribed Benadryl and told to continue use of Triamcinolome and hydrocortisone on affected areas. (*Id.*)

---

[21] Lipitor is an enzyme blocking medication used to decrease the amount of cholesterol in the blood. *See Atorvastatin (Oral Route)*, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/atorvastatin-oral-route/description/drg-20067003 (last visited Sept. 18, 2017).

[22] Loprox is used to treat fungal infections. *See Ciclopirox (Topical Route)*, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/ciclopirox-topical-route/description/drg-20062888 (last visited Sept. 18, 2017).

In January 2000, Plaintiff was diagnosed with strep pharyngitis.  (Tr. 366−67.)  On February 22, 2000, it was noted that Plaintiff had a history of chronic obstructive pulmonary disease ("COPD"), but that the condition was stable.  (Tr. 360.)  On April 13, 2000, Dr. E. Liu, who treated Plaintiff at Bellevue's Primary Care Clinic, stated that Plaintiff had no thyroid complaints, but complained of COPD and a heart condition.  (Tr. 359.)  In September 2000, Plaintiff was prescribed Sudafed for an upper respiratory infection.  (Tr. 356.)  A chest x−ray from December 29, 2000, showed "no focal pulmonary infiltrate, plural effusion, or pneumothorax," and the "cardio-mediastinal silhouette was within normal limits."  (Tr. 1148.)  On March 29, 2001, Plaintiff presented to primary care physician, Dr. Jen Lin, in a wheelchair.  (Tr. 250.)  Dr. Lin noted that Plaintiff used the wheelchair for tachycardia[23] and shortness of breath; however, she noted that Plaintiff was physically able to walk.  (*Id.*)  Plaintiff had decreased reflexes and proximal weakness in the lower extremities, as well as an abnormal gait.  (*Id.*)  An ECG from the same day was normal and revealed a normal sinus rhythm.  (Tr. 162.)

On May 1, 2001, Dr. X. Gao, a neurologist, examined Plaintiff and noted that she complained of generalized weakness since 1996.  (Tr. 249, 1164.)  Dr. Gao assessed Plaintiff's lower left extremity strength at 3/5 and lower right extremity strength at 4/5, and Plaintiff's motor strength at 5/5.  (*Id.*)  Dr. Gao also opined that Plaintiff had a slow gait.  (*Id.*)  Listing myelopathy[24]

---

[23] Tachycardia is a heart disorder in which the heart beats faster even while at rest.  *See Tachycardia*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/tachycardia/home/ovc-20253857 (last visited Sept. 18, 2017).

[24] Myelopathy is a spinal cord disorder that can result in many symptoms including neck, arm, and lower back pain, as well as difficulty walking.  *See Myelopathy*, JOHN HOPKINS MEDICINE HEALTH LIBRARY, http://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/myelopathy_22,Myelopathy/ (last visited Sept. 18, 2017).

as a rule-out diagnosis, Dr. Gao prescribed Plaintiff Neurontin[25] and ordered further testing including an MRI of the brain and cervical spine. (*Id.*) On May 15, 2001, Dr. Gao noted that the Neurontin had improved Plaintiff's numbness symptoms. (Tr. 247, 1164.) Dr. Gao listed a primary diagnosis of myelopathy on an order form for an electric wheelchair in May 2001. (Tr. 1120−21.)

A June 11, 2001 MRI of Plaintiff's brain was normal. (Tr. 1147.) On June 26, 2001, Dr. Lin opined that Plaintiff had symptoms like panic attacks and made a note to "rediscuss" the shortness of breath and asthma in the future. (Tr. 242.) Dr. Lin further noted that Plaintiff's tachycardia was "likely [secondary] to medication." (*Id.*) In August 2001, Dr. Lin remarked that Plaintiff's MRI showed a mild cervical spondylosis mass behind the left mandibular gland, but that Plaintiff's PFT and all other exams were within normal limits. (Tr. 333.) A July 2001 note from neurology stated that the mass "appear[ed] unrelated to [the] current work[ing] [diagnosis]." (Tr. 241.) After a routine eye exam on August 30, 2001, Dr. Kleiman, an ophthalmologist, wrote that Plaintiff showed no signs of retinopathy. (Tr. 236.)

In a follow-up neuropathic exam with Plaintiff on October 12, 2001, Dr. Gao noted the possibility of general weakness and peripheral neuropathy, and that Plaintiff's lower extremity strength measured 3/5. (Tr. 235.) He also renewed Plaintiff's prescription for Neurontin and advised Plaintiff to reschedule electromyogram and nerve conduction velocity testing. (*Id.*) In December 2001, Dr. Lin noted that Plaintiff refused to undergo psychiatric evaluation and questioned whether Plaintiff was wheelchair-bound secondary to a psychiatric disorder. (Tr. 232.)

---

[25] Neurontin is an anticonvulsant typically used to prevent seizures. It is also used to "relieve pain for certain conditions in the nervous system." *Gabapentin (Oral Route)*, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited Sept. 18, 2017).

In January 2002, Plaintiff complained of tachycardia after 5 minutes of ambulation during a visit; however, her pulse and blood pressure remained stable during this time. (Tr. 228.) The physician reported that Plaintiff had a full range of motion in all extremities, and her strength was 5/5 in her upper and lower extremities. (*Id.*) The physician concluded that Plaintiff did not meet the criteria for an electric wheelchair and recommended a neurological or psychiatric evaluation in light of his findings. (*Id.*)

       b.     <u>Dr. George Hall and Dr. Oppenheimer (March 2000 to April 2001)</u>

Dr. George Hall treated Plaintiff from March 11, 2000, to April 3, 2001. (*See* Tr. 156−224.) On March 11, 2000, Plaintiff complained of a skin rash, but denied having chest pain, abdominal pain, or shortness of breath. (Tr. 216.) Plaintiff showed no signs of atrophy, edema, or cyanosis, nor was there a motor or sensory deficit. (Tr. 214.) Plaintiff's lungs were clear to auscultation and percussion with no crackles or rales. (*Id.*) Her pulses were regular and systematic with no heart murmur or rub. (*Id.*) In a follow up visit on March 17, 2000, Dr. Hall wrote that Plaintiff complained of having left leg pain when she walked "a lot." (Tr. 212.) Dr. Hall noted that Plaintiff had left leg and knee tenderness. (*Id.*) Dr. Hall reported no abnormalities for Plaintiff's heart and lungs. (*Id.*) Finding no other abnormalities and noting that Plaintiff denied chest pain, palpitation, and shortness of breath, Dr. Hall diagnosed Plaintiff with gastroenteritis. (Tr. 211.) On April 8, 2000, Dr. Hall diagnosed Plaintiff with leg cramping, shortness of breath and tachycardia on exertion. (Tr. 210.) As part of his treatment plan, he listed "wheelchair for leg cramp when walking and [shortness of breath and] palpitations on exertion, fatigue on exertion." (*Id.*) On April 11, 2000, Dr. Hall reported that Plaintiff complained of palpitations and chest tightening on exertion. (Tr. 209.) He noted that her pulse was rapid. (*Id.*)

Plaintiff continued to complain of leg cramps, and was referred to New York Downtown Hospital for further evaluation of her symptoms on April 18, 2000. (Tr. 208, 632.) Dr. Beno Oppenheimer, who treated Plaintiff at New York Downtown Hospital, reported on April 24, 2000, that Plaintiff's studies revealed no evidence of ischemia[26] and that her 2D Echo and ECGs were normal. (Tr. 639.) Noting that Plaintiff's heart rate was 98 beats per minute, Dr. Oppenheimer opined that there was no evidence of cardiac disease. (*Id.*) In a physical examination also conducted on April 24, 2000, it was noted that Plaintiff complained of palpitations worsening on exertion; Plaintiff was referred to the cardiology department. (Tr. 207.)

Throughout May 2000, Plaintiff complained of body skin rashes, itching, diarrhea, abdominal pain, nausea, palpitations, shortness of breath, dizziness, sinus inflammation, and throat discharge. (Tr. 204−206.) On May 21, 2000, Plaintiff was diagnosed with sinusitis, vaginitis, chronic skin itching, and acne valgaria. (Tr. 205.) On May 24, 2000, Dr. Hall authorized Plaintiff to use non-emergency ambulette services via a Medicaid transportation prior approval form. (Tr. 640−43.) According to the form, Plaintiff reportedly had arthritis, asthma, congestive heart failure, resting tachycardia, and shortness of breath on exertion. (Tr. 640.) Dr. Hall noted that Plaintiff could ambulate inside using only a cane, and that Plaintiff required an escort to ambulate outside or to use a bus or a subway. (Tr. 641.) He also indicated that Plaintiff needed to be lifted or carried up and down stairs to enter or exit from her home or a medical office. (*Id.*) On May 30, 2000, Dr. Hall examined Plaintiff for complaints of on and off heart palpitations, throat discharge, purulent sinus inflammation, and vaginal itching. (Tr. 204.) Plaintiff reported no pulmonary, cardiovascular, or neurological abnormalities, but noted that Plaintiff did use a wheelchair. (*Id.*)

---

[26] Ischemia is a local loss of blood due to a mechanical obstruction of the blood vessel. *See Ischemia*, STEDMAN'S MEDICAL DICTIONARY 457640.

On May 30, 2000, Dr. Hall also wrote a note opining that Plaintiff was "unable to work physically at th[at] time." (Tr. 157.)

On June 7, 2000, Plaintiff visited Dr. Hall for treatment of a skin rash and a stuffy nose. (Tr. 203.) She also continued to complain of palpitations upon exertion, though she denied chest pains. (*Id.*) Dr. Hall noted tachycardia, yet reported no pulmonary or neurological problems. (*Id.*) On August 17, 2000, in a note "To Whom It May Concern," Dr. Hall listed Plaintiff's diagnoses as resting tachycardia, shortness of breath, palpitations on exertion, leg cramps and fatigue when walking, hypercholesterolemia, chronic skin pruritus, allergic rhinitis, acute sinusitis, asthma, and recurrent vaginitis." (Tr. 156.) He noted that the wheelchair was prescribed for Plaintiff's palpitations, shortness of breath, leg cramps, and fatigue when walking. (*Id.*) Dr. Hall opined that Plaintiff needed "continuous medical attention and assistance." (*Id.*)

On August 21, 2000, Dr. Hall diagnosed Plaintiff with an upper respiratory infection and allergic dermatitis; however, he otherwise reported no pulmonary, cardiovascular, or neurological problems. (Tr. 202.) Findings were similar four days later on August 25, though Plaintiff complained of gastrointestinal problems. (Tr. 201.) In September 2000, Plaintiff complained of dizziness, fatigue, poor appetite, and itchy skin. (Tr. 199−200.) Plaintiff complained of itchy skin throughout the month of October, as well as joint pain on October 4, 2000. (Tr. 198–99.) Dr. Hall found no edema, cyanosis, motor or sensory deficit, or any other abnormalities at that time. (*Id.*)

Plaintiff's chief complaint on November 3, 2000, was "diabetes/high blood sugar" with the associated symptoms of body itchiness, thirst, and polyuria. (Tr. 167.) Dr. Hall also noted that Plaintiff complained of palpitations with exercise and anxiety, joint stiffness that was relieved with movement, rashes with excoriation on extremities and body, and leg weakness. Plaintiff was in a wheelchair, and exhibited an anxious mental state. (Tr. 168-70.) Dr. Hall reported no other

abnormalities. (*See* Tr. 167-170.) Dr. Hall diagnosed Plaintiff with palpitations, uncontrolled NIDDM, and atopic dermatitis. (Tr. 170.) In a separate note from the same day, Dr. Hall wrote that Plaintiff was physically disabled. (Tr. 158.) In a form, dated November 15, 2000, to the New York City Housing Authority, Dr. Hall stated that Plaintiff had been diagnosed with heart disease since 1996 and that she had been using a wheelchair prescribed by him since April 2000. (Tr. 159.) He opined that Plaintiff needed continuous medical care and assistance because she was unable to walk and was physically disabled. (*Id.*) He stated that he did not have the medical record before him when he completed the form. (*Id.*) In a progress narrative note, also dated November 15, 2000, Dr. Hall indicated that Plaintiff reported all previous complaints from November 3, 2000, as stable. (Tr. 178−79.) Plaintiff again did not report weakness, fatigue, wheezing, chest pains, muscle weakness, joint pains, loss of feelings or sensations, or gait disturbances. (Tr. 177−79.) Dr. Hall did note that Plaintiff was experiencing tachycardia, but also noted that there were no visible precordial pulsations or heaves, the rhythm was regular, S1 and S2 were normal, and there were no audible bruits, murmurs, gallops, pericardial rubs, or clicks. (Tr. 180.) Plaintiff was diagnosed with atopic dermatitis, palpitations, and fatigue and/or weakness in the legs. (*Id.*) A follow-up on November 28, 2000, had similar results, and all previous symptoms that Plaintiff had reported were listed as improved, except for the intermittent itchy skin, which was reported as stable. (Tr. 173−74.) Dr. Hall reported Plaintiff's tachycardia as improved and stated that Plaintiff's NIDDM was controlled. (Tr. 175.)

Dr. Hall's notes from December 2000 to April 2001 show that Plaintiff reported itching skin and epigastric upset. (Tr. 190−96.) Dr. Hall also noted that Plaintiff continued to suffer from NIDDM, itchy skin, high cholesterol, vaginitis, hypothyroidism, diarrhea, allergic rhinitis, allergic dermatitis, and tachycardia. (*Id.*) On February 6, 2001, in a note "To Whom It May Concern:"

Dr. Hall wrote that it "will be more beneficial if she [is] still on her wheelchair until her cardiac condition improve[s]." (Tr. 625.)

   c. <u>Bellevue Hospital Center (After March 27, 2002)</u>

On May 30, 2002, Plaintiff had a follow-up examination for her previously diagnosed conditions. (Tr. 322.) The examining physician noted lower extremity weakness, but also noted that upper extremity motor function was normal. (*Id.*) Plaintiff's NIDDM was reported as poorly-controlled and her cholesterol as well-controlled. (*Id.*) Additionally, it was noted that Plaintiff's cardiac history had never been documented. (*Id.*) An ECG from the same day, showed a normal sinus rhythm and a non-specific T-wave abnormality. (Tr. 301.) Another ECG conducted on July 1, 2002, revealed a mildly increased left ventricular ejection fraction, but was otherwise a normal study. (Tr. 304.) June and October 2002 examinations in which Plaintiff complained of a cough and thyroid issues, respectively, did not result in any other pulmonary or cardiac abnormalities. (Tr. 319−20.)

On January 7, 2003, Plaintiff complained of experiencing chest and back pain after taking Zyrtec D. (Tr. 297.) A January 29, 2003 ultrasound of Plaintiff's thyroid identified a heterogeneous left thyroid lobe with two discrete nodules. (Tr. 1146.)

On February 17, 2004,[27] Dr. James Murphy, noted that Plaintiff was in a wheelchair for "no clear reason." (Tr. 1137.) He opined that Plaintiff had a complicated medical history with

---

[27] The Court notes that between January 2003 and February 2004, the medical records do not indicate that a physician examined Plaintiff, though she frequently visited the Bellevue clinic to request prescription refills. She also received a flu shot during this period. (*See* Tr. 288–96.)

possibly malingering[28] or Munchausen[29] with other psychiatric components.  (*Id.*)  Dr. Murphy further noted that Dr. Lin had discontinued Plaintiff's prescriptions for Serevent and Zocor because there was no evidence of increased cholesterol and Plaintiff's asthma diagnosis was unclear.  (*Id.*)  Dr. Lin had intended to conduct a PFT when Plaintiff was off the medication.  (*Id.*)  After Dr. Murphy explained that Plaintiff should not take the medication until Dr. Lin could re-evaluate her, Plaintiff became agitated and requested a new primary care physician, asking specifically for Dr. Tanner.  (*Id.*)  Dr. Murphy agreed to arrange for a new physician, and told Plaintiff that he would not provide her with Serevent or Zocor[30] until she underwent further evaluation.  (*Id.*)

A March 3, 2004 pulmonary examination revealed that there was no evidence of obstructive dysfunction at large airways and no bronchodilator response. (Tr. 283.)  On June 7, 2004, Plaintiff sought emergency contraception at the Bellevue clinic and was noted as being wheelchair-bound for no clear reason.  (Tr. 1135.)  During a follow-up exam for diabetes on July 27, 2004, Plaintiff was once again described as being wheelchair-bound for no clear reason.  (Tr. 1134.)  Plaintiff's diabetes was noted as controlled while her asthma was noted as well-controlled. (*Id.*)  Plaintiff had a regular heart rate and rhythm, and her lungs were clear to auscultate bilaterally. (*Id.*)  Plaintiff had no pain issues.  (*Id.*)  During Plaintiff's visit to the clinic on December 6, 2004,

---

[28] Malingering is the feigning of an illness or disability to escape work, elicit sympathy, or gain compassion.  *See Malingering*, STEDMAN'S MEDICAL DICTIONARY 524700.

[29] Munchausen syndrome is the "[r]epeated fabrication of clinically convincing simulations of disease for the purpose of gaining medical attention." The syndrome refers to people "who wander from hospital to hospital feigning acute medical or surgical illness and giving false and fanciful information about their medical and social background for no apparent reason other than to gain attention." *See Munchausen Syndrome*, STEDMAN'S MEDICAL DICTIONARY 885850.

[30] Zocor is used to reduce blood levels of low-density lipoprotein cholesterol. *Drugs: Simvastatin Information*, U.S. FOOD AND DRUG ADMINISTRATION, https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm203669.htm (last visited Sept. 18, 2017).

the examiner noted that Plaintiff had had an abnormal mammogram on November 9, 2004, and that Plaintiff was in a motorized wheelchair in no apparent distress. (Tr. 1133.) The physician also reported that Plaintiff walked with a halting gait with rhythmic hip flexion. (*Id.*) Plaintiff had a regular heart rate and rhythm, and her lungs were clear to auscultate bilaterally. (*Id.*) Plaintiff had no edema or pain issues at the time. (*Id.*) Plaintiff received prescriptions to treat her asthma and diabetes. (*Id.*)

At a January 6, 2005, routine gynecologic examination, Dr. Louis Mucelli reported that Plaintiff had a regular heart rate and rhythm and was experiencing no pain at the time. (Tr. 1011−12.) On February 15, 2005, Dr. Chen Tan, noted that Plaintiff had a flat affect, rhinorrhea, watery eyes and a cough; Plaintiff was diagnosed with an upper respiratory infection and reported no pain issues at the time. (Tr. 982.) On March 16, 2005, Dr. Tanner referred Plaintiff to ophthalmology after complaints of red, watery eyes. From April 2005 to November 2005, the ophthalmology clinic treated Plaintiff for blepharitis. (Tr. 975−76, 979, 981.) In a follow-up visit for her blepharitis with Dr. Tanner on August 2, 2005, he noted that Plaintiff had tachycardia with a 2/6 systolic murmur. (Tr. 977.) Dr. Tanner reported that Plaintiff was in a wheelchair in no apparent distress, that Plaintiff did not have edema or any pain issues at the time, and that her lungs were clear. (*Id.*)

When Plaintiff complained of dysuria on January 30, 2006, she was in a wheelchair, alert, active, and in no acute distress. (Tr. 974.) Plaintiff reported no pain issues at the time other than that associated with her cystitis diagnosis. (*Id.*) On February 16, 2006, Dr. Tanner again referred Plaintiff to an ophthalmologist for further treatment and evaluation of her left eye. (Tr. 1004.) On March 9, 2006, Dr. Tanner reported that Plaintiff's diabetes, lipids, and blood pressure were all well-controlled. (Tr. 972.) Plaintiff was alert, oriented, and in no apparent distress. (*Id.*) Dr.

Tanner noted a regular heart rate and rhythm, as well as clear respiratory function. (*Id.*) He also noted that Plaintiff was able to transfer from her wheelchair to the examination table without assistance and that she reported no pain or edema. (*Id.*) On October 4, 2006, Dr. Tanner again reported that Plaintiff's asthma, hypothyroidism, diabetes, and lipids were well-controlled. (Tr. 1097.) Plaintiff continued to use a motorized wheelchair and was still able to transfer to the examination table without difficulty. (*Id.*) Cardiovascular and respiratory findings were normal, and Plaintiff reported no pain or edema. (*Id.*)

On January 17, 2007, Dr. Tanner reported that Plaintiff was medically optimized for cataract surgery on her left eye. (Tr. 1094.) Plaintiff underwent left cataract surgery at Brook Plaza Ambulatory Surgical Center on February 5, 2007. (Tr. 1092.) She tolerated the procedure well and was transferred to the recovery room in good condition. (*Id.*)

On March 13, 2007, Plaintiff presented at Bellevue to have new lab tests taken; however, her most recent lab tests were less than two months old, and there was no indication that new tests needed to be taken. (Tr. 1051.) Plaintiff had no complaints and was doing well on her current medication. (*Id.*) Plaintiff was instructed to return in June 2007 for new lab tests. (*Id.*) On June 12, 2007, Dr. Tanner stated that Plaintiff's diabetes, blood pressure, lipids, and hypothyroidism were all well-controlled. (Tr. 1162.) His examination also revealed normal cardiovascular activity, and he reported that Plaintiff had no edema or pain issues at the time. (*Id.*)

Plaintiff returned to Dr. Tanner on March 31, 2009. (Tr. 1160.) Dr. Tanner stated that this was Plaintiff's first visit with him since June 12, 2007. (*Id.*) During the March 31, 2009 visit, Dr. Tanner noted that Plaintiff was in a motorized wheelchair, but in no acute distress. (Tr. 1160.) Plaintiff reported intermittent left upper back pain, which she treated with Lidoderm patches. (Tr. 1160−61.) Dr. Tanner reported that Plaintiff's diabetes was uncomplicated and that Plaintiff was

not experiencing any edema in the extremities; he diagnosed Plaintiff with benign essential hypertension. (*Id.*)

On September 2, 2009, Plaintiff presented to Dr. Reesheman Cowart, a podiatrist at the Bellevue Podiatry Clinic, with complaints of pain in the right lateral sinus tarsi and pain when walking. (Tr. 971.) Plaintiff stated that she had weakness when walking due to "nerve problems." (*Id.*) Upon examination, Dr. Cowart noted that Plaintiff experienced mild pain upon palpitation of the lateral right sinus tarsi. (*Id.*) Dr. Cowart reported 2+ distal pulses throughout joints without erythema, warmth, or swelling. (*Id.*) Dr. Cowart assessed the problem as unspecified enthesopathy of the ankle and tarsus. (*Id.*) He instructed Plaintiff to continue using Lidoderm patches, wearing proper shoe gear, and soaking her feet in warm water. (*Id.*) He also ordered x-rays for further evaluation. (*Id.*) The x-rays revealed no evidence of acute fracture or dislocation; there were no areas of erosion or aggressive appearing bone. (Tr. 1071.) The soft tissues were unremarkable. (*Id.*) However, the x-ray identified a small posterior calcaneal enthesophyte[31] and a small os tibiale externum.[32] (*Id.*)

Plaintiff was scheduled to undergo cataract surgery on her right eye ("Right Cataract Surgery") on October 21, 2009. (Tr. 969.) During a pre-operative clearance examination on October 5, 2009, Dr. Tanner reported that Plaintiff's blood pressure, lipids, diabetes, and thyroid

---

[31] An enthesophyte is a bone spur. *See The Mechanism of Formation of Bony Spurs (Enthesophytes) in the Achilles Tendon*, U.S. NATIONAL LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/pubmed/10728751 (last visited Sept. 28, 2017). The calcaneus is the heel bone. *See Calcaneus (Heel Bone) Fractures*, AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS, http://orthoinfo.aaos.org/PDFs/A00524.pdf (last visited Sept. 28, 2017).

[32] An accessory navicular, also known as os tibiale externum, is "an extra bone or piece of cartilage located on the inner side of the foot just above the arch." *See Accessory Naviular Syndrome*, AMERICAN COLLEGE OF FOOT AND ANKLE SURGEONS, http://www.acfas.org/footankleinfo/Accessory_Navicular_Syndrome.htm (last visited Sept. 18, 2017).

function were all well-controlled. (*Id.*) Further, he reported that Plaintiff was in no apparent distress and able to transfer from her wheelchair to the examination table. (*Id.*) Neurological examination revealed markedly weak hip flexion bilaterally. (*Id.*) No cardiovascular or respiratory abnormalities were reported. (*Id.*) Plaintiff did not have pain issues at the time. (*Id.*) Clearing Plaintiff for Right Cataract Surgery, Dr. Tanner noted that Plaintiff's revised cardiac risk index was zero, no cardiac preoperative evaluation was indicated, and Plaintiff was medically optimized. (*Id.*) Medications for diabetes, hypothyroidism, benign essential hypertension, mixed hyperlipidemia, and asthma were continued; Plaintiff was instructed not to take aspirin beginning a week before the surgery. (Tr. 969−70.) Additionally, Dr. Tanner assessed that Plaintiff had developmental coordination disorder of unclear etiology. (Tr. 970.) Plaintiff underwent Right Cataract Surgery at Brook Plaza Ambulatory Surgical Center on October 21, 2009. (Tr. 1103.) Plaintiff tolerated the procedure well. (*Id.*)

Plaintiff visited the Bellevue Clinic on October 30, 2009, to request refills for Lidoderm patches and eye drops. (Tr. 967.) No pain issues were reported. (*Id.*)

On November 9, 2009, Plaintiff again presented to the Bellevue with complaints of foot pain. (Tr. 965−66.) Dr. Ramin Hastings, reported that Plaintiff complained of a mass on her foot and a fullness around her ankle, as well as pain that occurred randomly. (Tr. 965.) Plaintiff was concerned that the bump on her foot was a lymph node and that she had cancer. (*Id.*) Dr. Hastings noted that Plaintiff was wheelchair-bound, was able to transfer from her wheelchair to the exam table, and appeared to be in no acute distress. (*Id.*) Plaintiff denied fatigue, chest pain, dyspnea,[33] or cough. (*Id.*) She had a normal heart rate and rhythm, and her lungs were clear to auscultate

---

[33] Dyspnea is the shortness of breath. *See Shortness of Breath*, MAYO CLINIC, http://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890 (last visited Sept. 18, 2017).

bilaterally.  (*Id.*)  Upon examination of the extremities, Dr. Hastings noted no cyanosis, clubbing, or edema, and that distal pulses were 2+ throughout.  (*Id.*)  Plaintiff experienced no pain upon palpitation of the foot; though, Dr. Hastings reported a small soft lesion on the plantar aspect of the right ankle joint, which was non-tender, moveable, and non-erythematous.  (*Id.*)  Dr. Hastings reported similar findings on Plaintiff's other foot and ankle.  (*Id.*)  Plaintiff was assessed with enthesopathy of the ankle and tarsus.  (Tr. 966.)  Plaintiff reported minimal pain, though Dr. Hastings noted that she was using many Lidocaine patches on her feet.  (*Id.*)  Dr. Hastings ordered x-rays of the left foot, and referred Plaintiff to podiatry noting that Plaintiff had failed to follow up after a previous examination in September 2009.  (Tr. 965−66.)  Same day x-rays of the left foot revealed minimal arthrosis at the metatarsophalangeal joint of the first toe and a small accessory navicular.  (Tr. 1070.)  No calcaneal enthesophyte, acute fracture or dislocation was found.  (*Id.*)

On February 2, 2010, Plaintiff was examined by Debra A. Galione, N.P., for complaints of a cough.  (Tr. 963−64.)  Plaintiff denied experiencing asthma symptoms, myalgia, fatigue, chest pain, chest tightness, lower extremity edema, dyspnea, wheezing, or shortness of breath.  (*Id.*)  No cardiovascular abnormalities were noted.  (*Id.*)  Sudafed was prescribed for an acute upper respiratory infection and nasal congestion.  (Tr. 964.)  Plaintiff reported no pain issues during her visit.  (Tr. 963.)

In April and May 2010, Plaintiff returned to the clinic to renew her prescriptions.  (Tr. 961−62.)  She reported no pain issues at either visit.  (*Id.*)  On August 2, 2010, Dr. Tanner reported that Plaintiff presented without complaints.  (Tr. 959−60.)  Blood pressure, diabetes, and lipids were well-controlled.  (Tr. 959.)  Plaintiff's eyesight was better following cataract surgery.  (*Id.*)  Dr. Tanner noted that Plaintiff was wearing Lidocaine patches on her elbows, ankles, left buttock, and right inner thigh.  (*Id.*)  Plaintiff was in no apparent distress and able to transfer from the

wheelchair to the examination table. (*Id.*) Neurological examination revealed 4+ hip flexion bilaterally. (*Id.*) No cardiovascular or respiratory abnormalities were noted. (Tr. 959−60.) Dr. Tanner continued prescriptions for Plaintiff's diabetes, benign essential hypertension, hypothyroidism, allergic rhinitis, asthma, and mixed hyperlipidemia. (*Id.*)

On September 16, 2010, ophthalmologist Yonah Hamlet, M.D., reported that Plaintiff's eyesight was 20/20 bilaterally after having previously been assessed as 20/20 in the right eye and 20/30 in the left eye on March 5, 2010. (Tr. 1085−86.)

In a letter dated October 21, 2010, Dr. Tanner noted that Plaintiff was able to transfer from the wheelchair to the examination table during visits. (Tr. 1118.) He also stated that Plaintiff had required a wheelchair for many years and was unable to walk more than a few feet at a time, and that he considered Plaintiff to be medically disabled because of severe bilateral lower extremity weakness. (*Id.*)

Plaintiff presented to the Bellevue Podiatry Clinic in October 2010 with pain in her posterior heel and with swelling in the "sinus tarsi area b/1 feet." (Tr. 958.) Dr. Cowart noted positive pain upon palpitation of the posterior Achilles tendon bilaterally. (*Id.*) Dr. Cowart diagnosed Plaintiff with unspecified enthesopathy of the ankle and tarsus. (*Id.*) A lower extremity MRI from December 8, 2010, revealed incomplete evaluated edema within the right flexor halluces longus and soleus muscles, as well as a similar edema pattern on the left side.[34] (Tr. 1067.) Diagnostic considerations included chronic exertional muscle compartment syndrome or muscle strain. (*Id.*) The report noted that other infectious and inflammatory etiologies for myositis, including polymyositis,[35] were to be considered. (*Id.*) On December 15, 2010, Plaintiff, still

---

[34] The exam revealed swelling in Plaintiff's calf muscles and ankles.

[35] Polymyositis is an inflammatory disease that causes bilateral muscle weakness. Its symptoms include difficulty climbing stairs, rising from a seated position, and lifting objects or

complaining of pain in both feet, followed up with Dr. Cowart. (Tr. 956.) Plaintiff was administered an injection of Lidocaine in each foot and instructed on proper foot care. (*Id.*)

Plaintiff received refills for Flonase and Lidoderm patches on November 10, 2010. (Tr. 957.) She returned to the clinic for refills of her diabetes medication on December 31, 2010. (Tr. 1126−27.) On January 20, 2011, Plaintiff's prescriptions for Hydroxyzine and Ranitidine were refilled. (Tr. 1053.) On February 7, 2011, she asked for renewals of Lidoderm, Lipitor, and Singulair. (Tr. 955.) Dr. Rahman noted that there was an issue of repeat prescriptions. (*Id.*)

On February 9, 2011, Plaintiff returned to the Podiatry Clinic for a follow-up with Dr. Cowart. (Tr. 993−94.) Plaintiff reported decreased pain to the bilateral sinus tarsi. (*Id.*) Dr. Cowart noted that Plaintiff had an unstable gait. (*Id.*) Examination revealed joints without erythema, warmth, or swelling. (*Id.*) Distal pulses were 1+ throughout the extremities. (*Id.*) Dr. Cowart assessed Plaintiff with enthesopathy of the ankle and tarsus, and administered an injection of Lidocaine. (*Id.*)

On March 4, 2011, Dr. Cowart performed a follow-up examination of Plaintiff, in which she reported decreased pain. (Tr. 992.) Dr. Cowart noted positive mild pain upon palpation of the lateral sinus tarsi. (*Id.*) Plaintiff's motor strength was assessed throughout at 5/5, and her sensory was intact. (*Id.*) Dr. Cowart reported 2+ distal pulses throughout the extremities with no erythema, warmth, or swelling. (*Id.*) Dr. Cowart assessed Plaintiff with enthesopathy of the ankle and tarsus, and administered an injection of Lidocaine. (*Id.*)

---

reaching overhead. It is an uncommon disease that has been known to emerge over weeks or months typically affecting people in their 30s, 40s, and 50s. *See Polymyositis*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/polymyositis/home/ovc-20341050 (last visited Sept. 18, 2017).

On March 13, 2011, Dr. Tanner signed an environmental assessment for mobility equipment form indicating that Plaintiff was able to use her wheelchair in her apartment. (Tr. 1112−13.) On March 25, 2011, Plaintiff requested prescription refills and an electric wheelchair from Hazel Alviar, a physician's assistant in the Bellevue Clinic. (Tr. 995.) Plaintiff received refills of Flonase and Gabapentin. (*Id.*) Ms. Alviar listed Plaintiff's clinical indication as "lumbago" and referred her to the Social Work department and to the Brace Clinic for evaluation before receipt of an electric wheelchair. (*Id.*) On June 8, 2011, Dr. Jennifer Knishinsky reported that Plaintiff requested unscheduled medication refills of Lidoderm and Albuterol. (Tr. 996.)

On August 2, 2011, Dr. Tanner prescribed a motorized wheelchair. (Tr. 1117.) The next day, Plaintiff was examined at the Bellevue Emergency Clinic for complaints of arm pain. (Tr. 1109−11.) X-rays of the left shoulder were unremarkable. (Tr. 1065.)

On September 6, 2011, Plaintiff requested refills of Fluticasone, Ranitidine, and Lipitor. (Tr. 996.) Dr. Kara Greenwald noted that Plaintiff frequently came in for refills. (*Id.*) On the same day, a physician's order signed by Dr. Tanner described Plaintiff as having developmental coordination disorder and marked thigh weakness. (Tr. 1116, 1119.) Dr. Tanner wrote on a form regarding Plaintiff's need for mobility assistive equipment that Plaintiff had "[coronary] heart disease and [angina], obstructive lung disease etc." (Tr. 1114.) He described Plaintiff as "[generally] weak, tired, and [having] eye [cataracts]." (*Id.*) He stated that Plaintiff could not use a cane, walker, or scooter for daily activities. (*Id.*) Dr. Tanner reported that Plaintiff did not have a caregiver and could not self-propel in a manual wheelchair. (*Id.*) Dr. Tanner opined that "she need[s] the power wheelchair [for a] life time." (Tr. 1117.)

On October 14, 2011, Dr. Michael Cantor, of the Ambulatory Care Clinic at Bellevue, treated Plaintiff for a urinary tract infection. (Tr. 990.) Plaintiff denied chest pain and dyspnea.

(*Id.*)  No cardiovascular or respiratory abnormalities were noted.  (*Id.*)  Plaintiff had no other complaints.  (*Id.*)  In a consultation request, Dr. Cantor further noted that Plaintiff was wheelchair-bound due to leg weakness, but had never had physical therapy.  (Tr. 997.)

On December 10, 2011, Dr. Owen Keiran, responded to interrogatories intended for Dr. Tanner.  (Tr. 1151−58.)  The form was completed "by a review of medical records."  (Tr. 1157.) Dr. Keiran reported that Plaintiff had been treated for diabetes mellitus, hypertension, hypothyroidism, asthma, "leg weakness [secondary to] ?," and chronic pain syndrome.  (Tr. 1152.) He indicated that her current symptoms were foot pain and that her left leg weakness was greater than her right leg weakness.  (*Id.*)  With respect to clinical findings as of the last examination, Dr. Keiran noted that cranial nerves, deep tendon reflexes, station and gait, and gross and fine manipulation had not been tested.  (Tr. 1153−54.)  He also stated that motor testing, including muscle weakness and tone, were not described in the physical examination.  (*Id.*) Dr. Keiran indicated that Plaintiff did not have a significant abnormality in gait.  (Tr. 1154.)  Moreover, when prompted to indicate a reason for Plaintiff's wheelchair use, he stated that Plaintiff "reports that she [cannot] walk."  (*Id.*)  Dr. Keiran also indicated that sensory examination was not tested and mental status was not described.  (Tr. 1155.)  He also noted that plaintiff had no significant interference with communication.  (*Id.*)  When asked to describe any limitations of physical activity as demonstrated by fatigue, palpitation, dyspnea, or angina discomfort with ordinary physical activity, Dr. Keiran wrote: "See above.  Non ambulatory by [complaint].  Based on medical records."  (Tr. 1156.)  Dr. Keiran indicated that Plaintiff had no limitation on what she was able to lift and carry; however, he noted that she was in a wheelchair dependent position.  (*Id.*) Dr. Keiran stated that Plaintiff's ability to stand or walk was limited to an unspecified degree.  (Tr. 1157.)  He based this limitation on Plaintiff's own report that she was non-ambulatory.  (*Id.*)  There

was no limit on Plaintiff's ability to sit, nor were there other limitations including postural, manipulative, visual, communicative, and environmental. (*Id.*) Moreover, Dr. Keiran indicated that he could not provide a medical opinion regarding Plaintiff's ability to do work related activities because he only reviewed the medical records. (*Id.*)

On December 20, 2011, Plaintiff returned to Bellevue for a diabetes follow-up with Dr. Tanner. (Tr. 988−89.) Plaintiff's diabetes, lipids, blood pressure, and thyroid stimulating hormone were "all at target." (*Id.*) Dr. Tanner noted that Plaintiff was using a conventional wheelchair, and she was still able to transfer from the chair to the examination table. (*Id.*) No abnormalities were noted with regard to cardiovascular or respiratory function. (*Id.*) Examination revealed no edema of the extremities. (*Id.*) Dr. Tanner continued Plaintiff's medications for hypothyroidism, benign essential hypertension, lumbago, asthma, and mixed hyperlipidemia. (Tr. 988−89.)

Plaintiff presented to the Bellevue Clinic on January 11, 2012, with complaints of a cough. (Tr. 985−87.) Plaintiff reported occasionally using Albuterol three times a day, though her typical use was once daily. (Tr. 985.) The examining nurse practitioner, Debra Galione, noted that Plaintiff had been diagnosed with asthma in 1997, yet she had not had any emergency room visits, hospitalizations, or steroids. (*Id.*) Plaintiff's peak flow was measured at 550 with 98% pulse oxygen. (*Id.*) Plaintiff denied fatigue, chest pain, and dyspnea. (*Id.*) Nurse practitioner Galione noted no cardiovascular or respiratory abnormalities. (*Id.*) Examination of the extremities reveal no cyanosis, clubbing, or edema. (Tr. 986.) Plaintiff was diagnosed with a likely viral upper respiratory infection and prescribed Flunisolide for her symptoms. (*Id.*)

A consultation request from February 29, 2012, reveals that Dr. Tanner referred Plaintiff to the rehabilitation medicine clinic. (Tr. 999.) Dr. Tanner reported that Plaintiff was a diabetic who had been using a motorized wheelchair for years and was applying for a new one. (*Id.*) Dr.

Tanner noted that it was unclear why Plaintiff was wheelchair-dependent, so he asked for re-evaluation of the need for a motorized wheelchair. (*Id.*)

On April 13, 2012, Plaintiff sought medication refills from the Bellevue Clinic. (Tr. 983−84.) She also complained of dysuria. (*Id.*) Plaintiff denied chest pain and dyspnea. (*Id.*) No cardiovascular or respiratory abnormalities were noted. (*Id.*) On April 16, 2012, Plaintiff was prescribed Ampicillin to treat her dysuria. (Tr. 1077.)

On March 20, 2013, Dr. Hall responded to interrogatories from the SSA Office of Disability Adjudication and Review. (Tr. 1181−82.) Dr. Hall wrote that he had diagnosed Plaintiff with NIDDM, itching skin, and hypocholesteremia. (Tr. 1181.) He stated that high sugar in Plaintiff's blood test, complaints of skin itching, and high cholesterol in Plaintiff's blood test were the objective or diagnostic evidence for his diagnoses. (*Id.*) When asked if Plaintiff was ever evaluated by a neurologist or other medical professional for a wheelchair or motorized wheelchair, Dr. Hall replied, "No." (*Id.*) He further responded that Plaintiff's resting pulse and resting ECG showing tachycardia, as well as her complaints of palpitations, shortness of breath, leg cramps, and fatigue, supported the need for a wheelchair. (*Id.*) When asked whether Plaintiff had a pulmonary disease, Dr. Hall reported that Plaintiff had shortness of breath on exertion. (*Id.*) Dr. Hall then expressed doubt concerning Plaintiff's history of asthma and stated that no PFT had been done. (*Id.*) Lastly, Dr. Hall answered that during the time he was treating Plaintiff, there was no objective evidence that would support a heart condition. (Tr. 1182.)

In January and February 2014, after last examining Plaintiff on December 24, 2013, Dr. Gao completed order forms requesting a motorized wheelchair for Plaintiff's lifetime. (Tr. 883-97.) Dr. Gao listed diagnoses of peripheral neuropathy, wrist pain, adhesive capsulitis of the shoulder, cervicalgia, and muscle weakness. (Tr. 883.) Dr. Gao separately listed diagnoses of

lumbar disc displacement, superficial phlebitis of the leg, edema, and atherosclerosis of native arteries of the extremities, not otherwise specified.  (Tr. 884.)  Dr. Gao further stated that Plaintiff had been diagnosed with peripheral neuropathy for over 10 years, that she was in a wheelchair and was not able to walk more than a few steps at home, and that she had chronic neck and lower back pain.  (Tr. 884, 891.)  She also had left side weakness.  (Tr. 891.)  Dr. Gao stated that Plaintiff needed a power wheelchair to independently get around inside and outside of her home.  (Tr. 884.)  Her cardio status was noted to be impaired with functional limitations "on exertion."  (Tr. 885.)

A May 14, 2014 MRI of the right ankle revealed no soft tissue mass at the site of clinical concern, and noted that unencapsulated lipomas were difficult to exclude on imaging.  (Tr. 903-04.)  An August 14, 2014 CT-scan for hematuria revealed unremarkable findings, aside from mild bilateral renal cortical scarring, which may be related to prior ascending collecting system infections.  (Tr. 902.)

On August 27, 2014, Dr. Hall's physician's assistant, Peter Wong, completed a medical request for home care for three days per week, listing Plaintiff's diagnoses as follows: uncontrolled NIDDM; asthma without acute exacerbation; postsurgical hypothyroidism; chronic gastritis, without mention of hemorrhage; pure hypercholesterolemia; difficulty in walking; pain of the ankle and/or heel; and diabetic neuropathy (nerve damage from diabetes).  (Tr. 898–901.)  The form also noted "limited range of motion, muscular motor impairment;" it listed diagnoses of diabetes since 1998; pulmonary block disease since 1996; neuroglia pain 2000; high cholesterol since 1998; and stomach disorder since 1998.  (Tr. 899–900.)  The form indicated that Plaintiff had been referred for skilled nursing and a homecare aide on December 2, 2013.  (Tr. 901.)

A June 9, 2015 endoscopic evaluation yielded an impression of mild gastritis and gastroesophageal reflux disease (GERD), and biopsies revealed antral mucosa with mild chronic

gastritis, and gastric oxyntic type mucosa with mild chronic superficial non-specific gastritis. (Tr. 905-07.)

On July 24, 2015, Plaintiff was admitted for three days to St. John's Episcopal Hospital for treatment of diverticulitis. (Tr. 908-16.)

### 2. Consultative Physicians

#### a. Dr. Steven Rocker (May 2002)

At the request of the Commissioner, Dr. Steven Rocker, M.D., performed a consultative examination of Plaintiff on May 20, 2002. (Tr. 252−59.) Plaintiff reported to Dr. Rocker that she had rapid heartbeat, shortness of breath, diabetes, and elevated cholesterol. (Tr. 252.) She also stated that she had had exposure to tuberculosis. (*Id.*) Dr. Rocker opined that Plaintiff was "questionably short of breath at rest." (*Id.*) He noted that she did not complain of chest pain, nor did she report polyphagia, polyuria, or polydipsia.[36] (*Id.*) Plaintiff had no complaints of visual impairment, paresthesia, or renal disorder. (*Id.*) Dr. Rocker opined that Plaintiff was "a suboptimal historian" as she was unclear about her medical history. (*Id.*) At the time, Plaintiff was taking the following medications: Zocor, Levoxyl,[37] Ranitidine, Neurontin, and Glucophage. (*Id.*)

Dr. Rocker described Plaintiff as well-developed, well-nourished, well-groomed, and in no acute distress. (*Id.*) Plaintiff presented in a wheelchair and propelled herself in her wheelchair by

---

[36] Common symptoms of diabetes mellitus include "increased urinary frequency (polyuria), thirst (polydipsia), hunger (polyphagia), and unexplained weight loss." *About diabetes*, WORLD HEALTH ORGANIZATION, http://www.who.int/diabetes/action_online/basics/en/index1.html (last visited Sept. 18, 2017).

[37] Levoxyl is a medication used to reduce the size of thyroid glands or goiters. *See Levothyroxine (Oral Route)*, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/levothyroxine-oral-route/description/drg-20072133 (last visited Sept. 18, 2017).

using her legs on the ground in a manner equivalent to walking. (*Id.*) Plaintiff was able to transfer to and from the examination table without difficulty. (Tr. 253.) Examination of the musculoskeletal system revealed that Plaintiff had extensible full function of the legs. (*Id.*) Dr. Rocker stated that Plaintiff was able to walk without real difficulty, though she claimed to be unable to heel walk, toe walk, or tandem walk, and she had no muscular atrophy. (*Id.*) All of Plaintiff's joints had a full range of motion and were without deformity, swelling, warmth, or tenderness. (*Id.*) The peripheral pulsations of Plaintiff's extremities were intact and she had no clubbing, cyanosis, or edema. (*Id.*) Neurological examination revealed hyporeflexia throughout and negative leg raising. (*Id.*) Plaintiff's motor and sensory functions were normal and her cerebellar functions were intact. (*Id.*) No cardiovascular or pulmonary abnormalities were noted. (*Id.*) Chest x-rays were negative. (Tr. 259.) Dr. Rocker found no objective cardiac impairment during the examination or after review of the available information despite reported history of tachycardia. (Tr. 253.) He noted Plaintiff's history of diabetes and hyperlipidemia. (*Id.*) In reference to Plaintiff's status post thyroidectomy, Dr. Rocker opined that it was not a limiting problem because Plaintiff was on replacement medication. (*Id.*) Dr. Rocker further noted that Plaintiff had possible peripheral neuropathy based upon her medication. (*Id.*) Dr. Rocker concluded that based on the objective finding, Plaintiff was able to perform sedentary, light, and moderate work activity. (*Id.*) His prognosis was fair. (*Id.*)

### b. Dr. Anthony Buonocore (May 2002)

On May 7, 2002, state agency medical consultant, Dr. Anthony Buonocore, M.D., reviewed Plaintiff's record to assess her need for a wheelchair. Dr. Buonocore reported that Plaintiff's dyspnea diagnosis and need for a wheelchair were unexplained by the record. (Tr. 263.) On June 19, 2002, in a subsequent review of the record, Dr. Buonocore noted that Plaintiff was able to walk into the exam room without assistance at her consultative examination with Dr. Rocker on May

20, 2002. (Tr. 262.) He also stated that Plaintiff's PFTs did not meet the Listing for an impairment. (*Id.*) He reported that Dr. Hall's medical practice had assured him that Plaintiff needed the wheelchair for any walking outside of the exam room. (*Id.*) Dr. Buonocore referenced the Bellevue Rehabilitation Service statement that Plaintiff became tachycardic after walking for five minutes. (Tr. 262; *see* Tr. 288.) Dr. Buonocore contacted Plaintiff's neurologist, Dr. Gao, on June 18, 2002. (Tr. 261.) Dr. Gao reportedly stated that neurological testing resulted in a negative work-up, including negative MRIs. (*Id.*) Dr. Gao also reported to Dr. Buonocore that Plaintiff had unexplained weakness without any abnormal neurological signs. (*Id.*) Dr. Buonocore concluded that Plaintiff could stand and walk two hours in an eight-hour day and could carry and/or lift ten pounds occasionally. (Tr. 265.)

### 3. Expert Medical Testimony

#### a. Dr. Richard Wagman

ALJ Wieselthier appointed Dr. Richard Wagman, M.D., to review Plaintiff's medical record and testify as an impartial medical expert at the ALJ Hearing on April 8, 2008. (Tr. 711−14.) Dr. Wagman testified that, since 2000, Plaintiff had been a non-insulin diabetic. He noted that the condition was adequately controlled. (Tr. 712.) He further testified that Plaintiff had a history of hypothyroidism secondary to two surgical procedures in 1996 and 1998; however, this condition was also well controlled. (*Id.*) With regard to Plaintiff's asthma, Dr. Wagman opined that the history was "vague" because Plaintiff's PFTs had been normal. (*Id.*) Plaintiff's walking problem had been worked up at Bellevue and described as a nonphysiological gait pattern. (*Id.*) Dr. Wagman explained that this description meant that the doctors had found nothing of an organic nature to explain Plaintiff's condition. (*Id.*) He referenced Dr. Rocker's statement that Plaintiff could walk without difficulty and stated that there was nothing in the record to suggest the need for a wheelchair. (*Id.*) Dr. Wagman noted that MRIs of Plaintiff's brain and spine had

been within normal limits. (*Id.*) Additionally, Dr. Wagman noted that there was no information available in the record to support Plaintiff's alleged eye cancer. (Tr. 713; *see* Tr. 703−04.) Dr. Wagman stated that he was not sure "how much of an impairment there [was] at all." (Tr. 713.) He then opined that Plaintiff would be able to perform light work. (*Id.*) After the hearing, Dr. Wagman received copies of records that had been subpoenaed from Dr. Hall. (Tr. 615.) Upon review of these records, Dr. Wagman indicated that the new evidence would not change his testimony. (Tr. 950; *see* Tr. 570−71.)

b.     Dr. Gerald Greenberg

At the hearing before ALJ Strauss on September 13, 2012, Dr. Gerald Greenberg, M.D., a board-certified specialist in pulmonary disease, testified as a medical expert. (Tr. 1255−69; 1271−75; *see* Tr. 820−24.) After reviewing Plaintiff's file, Dr. Greenberg opined on Plaintiff's medical history since March 27, 2002. (Tr. 1257.) Dr. Greenberg reported that Plaintiff's history included diabetes, two thyroidectomies, cataract surgery, lumbago, asthma, and complaints of peripheral neuropathy. (Tr. 1258, 1260, 1262.) Dr. Greenberg opined that Plaintiff's asthma was well-controlled. (Tr. 1264.) With respect to Plaintiff's cardiac condition, Dr. Greenberg noted the test performed by Dr. Oppenheimer, which indicated that there was no evidence of cardiac disease. (Tr. 1266−67; *see* Tr. 639.) While Plaintiff had reported pain in her left shoulder, Dr. Greenberg noted that no objective evidence or laboratory test existed to confirm a diagnosis of rheumatoid arthritis. (Tr. 1267−68.) Moreover, Dr. Greenberg reported that there were no documented impairments that could be attributed to Plaintiff's need for a wheelchair and the objective evidence did not indicate that she was necessarily limited to a wheelchair. (Tr. 1261, 1263, 1268.) Further, he noted that the physical examinations documented in Plaintiff's file would not preclude sedentary work. (Tr. 1263.) Dr. Greenberg recommended sending Plaintiff for a consultative examination, including a possible psychiatric evaluation. (Tr. 1268.) Dr. Greenberg concluded

that the record did not indicate that Plaintiff had an impairment that met or medically equaled a Listing.  (*Id.*)

### B.  Non-Medical Evidence

#### 1.  Plaintiff's Self-Reporting

In an SSA Disability Report dated March 20, 2002, Plaintiff stated the she was limited in her ability to work because of heart problems, tuberculosis, diabetes, high cholesterol, thyroid disease, skin problems, allergies, and breathing difficulties.  (Tr. 101.)  She reported that her illness began on January 1, 1996, and that she had not worked since that date.  (*Id.*)  Plaintiff stated that she stopped working because she was too tired and would fall asleep while working.  (*Id.*)  She had previously held jobs as a computer analyst and an office clerk.  (Tr. 102.)

Plaintiff noted that Bellevue Hospital had treated her for diabetes, high cholesterol, thyroid disease, breathing difficulties, skin problems, and allergies.  (Tr. 103.)  She also indicated that Dr. Hall had prescribed a wheelchair as treatment for her resting tachycardia, shortness of breath, palpitations on exertion, allergies, and skin problems.  (*Id.*)  She noted receiving INH treatment from the NENA Health Council and undergoing thyroid surgery in China.  (Tr. 104−05.)  Her medications at that time were Neurontin, Glucophage, Serevent, Zocor, Zyrtec, Ranitidine, Levoxyl, Lac−Hydrin, and Nitrostate.  (Tr. 106−08.)

On March 27, 2002, SSA field office representative "D. Farro" conducted a face-to-face interview with Plaintiff.  (Tr. 110−13.)  Farro noted that Plaintiff had filed a disability claim in February 1998, which was denied.  (Tr. 110.)  Farro indicated that Plaintiff had difficulties with understanding, coherency, concentrating, answering, standing, walking, and seeing.  (Tr. 112.)

In SSA reports from April 2002, Plaintiff stated that she began having chest pain in November 1995.  (Tr. 115.)  She reported that the pain eventually spread to her hand, leg, back, and neck causing her to feel tired and affected her ability to do daily activities.  (Tr. 115−17,

125−31.)  She stated that, in June 1996, she was diagnosed with cardiovascular disease at the Research Institute of Guangdong Province.  (Tr. 115.)  Plaintiff noted that she felt the pain whenever she had to lift something or concentrate for a long time.  (Tr. 116.)  She took nitroglycerin and Neurontin to relieve the pain.  (*Id.*)

Plaintiff reported that she lived alone in an apartment at the time and that her daily activities consisted of eating, doing laundry, loading the dishwasher, preparing simple meals, reading, listening to the radio, fixing clothes, playing computer games, and collecting stamps.  (Tr. 124-25.)  She stated that she needed a housekeeper and home attendant to help with mopping and cleaning because she was too tired to do those activities on her own.  (Tr. 126−27.)  Plaintiff reported that she went outside once every week or two with assistance, and she traveled using public transportation, but that she did not go out alone.  (Tr. 127.)  She stated that she was able to shop, pay bills, and handle a savings account.  (Tr. 128.)  Her social activity consisted of talking to someone "once in a while."  (Tr. 129.)  Plaintiff reported that her ability to lift things, stand, walk, sit, climb stairs, kneel, and use her hands were affected by her illnesses. (*Id.*)  She stated that she tried to avoid walking and that she could not concentrate for a long time because she was tired. (Tr. 130.)  During a telephone call on May 9, 2005, Plaintiff explained to the SSA district office that she would not attend consultative examinations because she already had a primary medical doctor.  (Tr. 553.)

### 2.    Plaintiff's Testimony

At the August 23, 2004 hearing before ALJ Wieselthier, Plaintiff testified as follows: She stated that she had been using a motorized wheelchair for nearly two years.  (Tr. 35, 59.)  Plaintiff lived in a wheelchair accessible apartment in New York City public housing ("City Housing").  (Tr. 40.)  She stated she received $254 per month in welfare payments, which she used to pay her monthly rent of $117.  (Tr. 41, 45.)  She had a license to drive a car, but had not driven since

34

January 1996.  (Tr. 43.)  She had traveled to the hearing by bus, and stated that she did not use the subway because of inconsistent wheelchair access.  (Tr. 43−45.)  Plaintiff testified that she had a Master of Computer Science from City College and was able to speak, read, and write English, Mandarin, and Cantonese.  (Tr. 46−47, 53.)  She stated that she had attended basic training for the United States Army, but was discharged.  (Tr. 47−49.)  Plaintiff reported that she had worked as a computer analyst in China from 1982 to 1987 and that she worked as an office clerk in New York until December 1995, but that she had to quit because she was too "sleepy."  (Tr. 49−51.)  Plaintiff reported that for activities she made clothes, collected stamps, watched television, listened to music, read newspapers, cooked, shopped, and performed household chores, including making her bed, cleaning, vacuuming, and ironing her clothes.  (Tr. 73−79.)  Plaintiff also stated she could dress herself and that she rarely visited friends, but visited her parents twice a year.  (Tr. 79−81.)

Plaintiff testified that her biggest problem at the time was that she felt too tired; however, she could not state the reason or provide a diagnosis that caused her fatigue.  (Tr. 54.)  Plaintiff stated that she received treatment for diabetes at Bellevue Hospital and was prescribed Actos and Metformin to treat the condition.  (Tr. 56−57.)  Plaintiff testified that medication helped with her thyroid problem.  (Tr. 58.)  She also testified that she was prescribed the motorized wheelchair because of general weakness.  (Tr. 59.)  The head, back, and leg pain that she experienced and treated with patches and Neurotin often lasted all day.  (Tr. 60−61, 63.)  Plaintiff testified that if she took more than two or three steps, or if she stood for more than a minute or two, her legs would begin to shake and she would become tired.  (Tr. 65.)  She also testified that she could pick things up from the floor, kneel, grip objects, and carry a gallon of milk.  (Tr. 67−70.)  Plaintiff stated that she saw a psychiatrist who told her that she did not have any mental impairments.  (Tr. 67.)

Additionally, Plaintiff reported that she had shortness of breath and that she had been diagnosed with asthma. (Tr. 82−83.)

On April 8, 2008, Plaintiff testified at a second hearing before ALJ Wieselthier. (Tr. 677−714.) Plaintiff again identified her activities as making clothes, watching television, reading the newspaper, shopping, and performing household chores. (Tr. 708−09.) She reported sleeping about 10 hours each day. (Tr. 707.) Plaintiff stated that Dr. Hall had prescribed the wheelchair because Plaintiff had a heart condition and was "too tired." (Tr. 680−81.) Plaintiff stated that her car had been repossessed in 1996, and that she had not driven since that time. (Tr. 683.) Plaintiff's friend had driven her to the hearing. (*Id.*) Plaintiff was still hesitant to use the subway because of the lack of ramps and elevators. (Tr. 685.)

Plaintiff clarified testimony that she had given at the 2004 hearing about being discharged from the Army, explaining that she was discharged because of her tuberculosis. (Tr. 686−87.) Plaintiff reiterated that her biggest problem was that she was tired and did not have the energy to stay awake. (Tr. 688.) Plaintiff testified that she had been visiting the Bellevue Clinic since 1998 for treatment of asthma and diabetes. (Tr. 688−89.) She reported that her diabetes and high cholesterol were under control. (Tr. 689, 691.) Plaintiff reiterated that she had difficulty walking more than one or two steps, or standing more than one or two minutes. (Tr. 694−95.) She also mentioned that she had back and leg pain. (Tr. 694, 699.) Plaintiff reported using Neurotin, Lidocaine patches, Chinese medicine, and massages to relieve pain. (Tr. 696, 699.) Plaintiff stated that she was still tired and she was often dizzy, which she partially attributed to her diabetes. (Tr. 697.) She testified that she could pick items up from the floor, and that she did not find sitting problematic, nor did she have issues grasping items. (Tr. 700.) Plaintiff later testified that if she

sat too long, she felt pain. (Tr. 706.) Plaintiff further testified to having received treatment for eye cancer, cataract surgery in her left eye, and two thyroid surgeries. (Tr. 698, 702−06.)

Another hearing was held before ALJ Strauss on September 13, 2012. (Tr. 1207−76.) Plaintiff testified that she had not worked in the last 15 years and had not driven since 1996. (Tr. 1215-16.) Plaintiff stated that dizziness and sleepiness had prevented her from working. (Tr. 1216-18.) Plaintiff had not seen a doctor for her "sleep problem." (Tr. 1220.) Plaintiff testified that she had taken medicine for tuberculosis, and then needed to "stay home and take a break." (*Id*.) Plaintiff still lived alone in her apartment, and a friend had driven her to the hearing. (Tr. 1215, 1238.) Plaintiff further reported that Dr. Gao at Bellevue Hospital prescribed a motorized wheelchair in 2001, because she could not walk due to her body being inflexible. (Tr. 1222−23.) Plaintiff used Access-A-Ride to visit her parents, and often traveled to other places by bus because the subway was unreliable. (Tr. 1239−40.)

At the time of the hearing, Plaintiff reported that she took three medications for her diabetes, which was sometimes uncontrolled. (Tr. 1225−26.) Plaintiff also reported taking Gabapentin for nerve pain throughout her body. (Tr. 1226−27.) Plaintiff specifically identified pain in her left shoulder, upper and lower back, neck, elbow, knees, ankles, hip, and buttocks. (Tr. 1227−29.) Gabapentin helped relieve the needle sensation Plaintiff often felt in her hands. (Tr. 1229.) Plaintiff testified that medication did not alleviate her shoulder pain, which she had experienced for more than a year. (Tr. 1230.) Plaintiff reported that she had tried to see a pain specialist; however, she felt as though physical therapy was not helpful. (Tr. 1245−46.) She testified that she was able to stand ten to twenty minutes, and sit one to two hours. (Tr. 1248.)

Plaintiff further testified that she had been prescribed Prednisone, which she took for a period of ten days, to relieve her bronchitis and persistent cough. (Tr. 1231−32.) She also testified

that she no longer had dizzy spells and that she had been diagnosed with a heart problem when she visited China in 1997. (Tr. 1233.) She went to China to receive medical care because she did not have insurance in the United States. (Tr. 1221.) At the time of the hearing, Plaintiff was taking Lisinopril for her fast heart rate; Ranitidine for stomach problems; Singulair for mucus and a cough; Advair, an asthma pump and Nasonex for asthma; Glimepiride and Actos for diabetes; Trilipix for cholesterol; Tramadol and Lidoderm patches for pain; and Hydroxyzine HCL for itching. (Tr. 1234−37.) Plaintiff wore glasses because she reportedly could not see at a distance. (Tr. 1244.) Plaintiff testified that she had tried physical therapy two times, but it had not helped with her conditions. (Tr. 1245−46.)

A typical day for Plaintiff involved preparing food for herself, washing clothes, cleaning her apartment, and watching television. (Tr. 1237.) She reported using her computer to write letters, watch movies, read news articles, shop, and communicate with friends via email or Facebook. (Tr. 1241.) Plaintiff also reported collecting stamps and stones, and that she sometimes made clothes with a foot-operated sewing machine. (Tr. 1240, 1245.) Plaintiff was able to feed, shower, and bathe herself, as well as care for other personal needs. (Tr. 1246.) She occasionally had trouble dressing herself because of left shoulder pain, though she reported being able to lift ten to twenty pounds with both arms. (Tr. 1246−50.) She testified that she had difficulty raising her left arm because of the pain, and an x-ray had revealed a "bruise." (Tr. 1249−1250.) She stated that she could stand for ten to twenty minutes, sit for one to two hours, and could only take two to three steps at a time. (Tr. 1248.)

Plaintiff reported that Bellevue Hospital had become difficult to visit because they did not treat her cough. (Tr. 1250.) She previously saw Dr. Tanner every six months at Bellevue; however, because her current wheelchair was not motorized, she was unable to visit him as often.

(Tr. 1251, 1253.)  Without a motorized wheelchair, she needed help pushing herself up and down a hill to get to and from a hospital.  (Tr. 1251−52.)  Additionally, Plaintiff testified that she refused to attend the scheduled consultative medical examinations because she believed the doctors created "fake reports."  (Tr. 1223−24.)

At a fourth hearing on August 6, 2015, before ALJ Friedman,[38] Plaintiff testified that she was in a wheelchair because she could not walk normally.  (Tr. 1197.)  She arrived to the hearing with her home attendant via Access-A-Ride.  (Tr. 1194, 1200−01.)  She stated that though she had stopped using one for a while, she had been using a home attendant for several years.  (Tr. 1198−99.)  She lived alone in her apartment, but she often received help from a friend, particularly with grocery shopping.  (Tr. 1197, 1199, 1204.)  Her home attendant assisted in preparing food and cleaning.  (Tr. 1204.)  A typical day for the Plaintiff involved making breakfast, watching television, and learning Spanish.  (Tr. 1204−05.)

Plaintiff reportedly suffered from coughing fits in the winter and was often unable to receive swift medical care from Bellevue, so she began seeing a private doctor.  (Tr. 1201.)  She reported that diabetes had caused vision problems that resulted in two cataract surgeries.  (*Id.*)  Plaintiff also experienced a frequent urge to urinate because of her diabetes.  (Tr. 1202.)  She stated that she had visited the Bellevue Emergency Center two or three months prior to the hearing due to her asthma.  (Tr. 1203.)

As in the September 2012 hearing, Plaintiff reported that she needed a new motorized wheelchair in order to be able to travel alone.  (Tr. 1205−06.)  She stated that her neurologist told her that her muscles were weak; therefore, she could not walk.  (Tr. 1197−98.)  She also mentioned

---

[38] After Plaintiff was determined to be a class member in the *Padro* lawsuit, her case was reassigned to ALJ Michael Friedman, who held a fourth hearing.  (Tr. 722, 831−36.)

that an infection had affected her walking.  (*Id.*)  She stated that she did not feel pain in her legs;

she lacked flexibility.  (Tr. 1199−1200.)  Plaintiff later testified that she felt pain if she pushed

down on her leg.  (Tr. 1203.)  Plaintiff testified that she could stand for a couple of minutes and

was able to take two or three steps before getting tired.  (Tr. 1200.)  She further stated that she

could sit for a couple of hours.  (*Id.*)  She also reported that her arms did not have strength.  (Tr.

1200.)

## DISCUSSION

### I.  STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act")

may bring an action in federal district court seeking judicial review of the Commissioner's denial

of their benefits "within sixty days after the mailing . . . of notice of such decision or within such

further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).

In reviewing a final decision of the Commissioner, the Court's role is "limited to determining

whether the SSA's conclusions were supported by substantial evidence in the record and were

based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting

*Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)) (internal quotation marks

omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d

409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and

internal quotation marks omitted)).  In determining whether the Commissioner's findings were

based upon substantial evidence, "the reviewing court is required to examine the entire record,

including contradictory evidence and evidence from which conflicting inferences can be drawn."

*Id.* (internal citation omitted).  However, "it is up to the agency, and not this court, to weigh the

conflicting evidence in the record."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.

1998).  If there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175−76 (2d Cir. 2013).

## II.     ELIGIBILITY     STANDARD     FOR     SOCIAL     SECURITY     DISABILITY     BENEFITS

To receive SSI, claimants must be disabled within the meaning of the Act.  Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The claimant bears the initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require.  42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(D); *but see Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal." (alterations and quotation marks omitted)).

ALJs must conduct a five-step inquiry to determine whether a claimant is disabled under the Act as set forth in 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1).  If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If so, the claimant is not disabled.  If not, the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe medically determinable physical or mental impairment that meets

the duration requirement." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the impairment is not severe, the claimant is not disabled. If the claimant has a severe impairment, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of part 404 ("Listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpart. P, Appendix 1.

If the ALJ determines at step three that the claimant has a listed impairment and meets the duration requirement, the ALJ will find the claimant disabled. *Id.* If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") before moving onto steps four and five. 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is an assessment of "the most [the claimant] can still do despite [his or her physical or mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At the fourth step, the ALJ considers whether, in light of the claimant's RFC, he or she is able to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If so, the claimant is not disabled. If not, the ALJ proceeds to the fifth step, where the burden shifts to the ALJ to demonstrate that the claimant has the capacity to perform other substantial gainful work existing in the national economy, considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If so, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

## III.    THE ALJ'S DECISION

On October 20, 2015, the ALJ issued a decision denying Plaintiff's claims. (Tr. 722−39.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 27, 2002. (Tr. 725.)

At step two, the ALJ found that Plaintiff had the following medically determinable impairments: diabetes mellitus, hypertension, asthma, sinusitis, reflux esophagitis, tachycardia, a small calcaneal enthesophyte, allergies, pruritus, neuropathy, a history of cataract surgeries, and a history of thyroidectomy. (*Id*.) However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) her ability to perform basic work activities for twelve consecutive months. (*Id*.) The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible. (Tr. 726.) The ALJ noted that at the September 13, 2012 hearing, Plaintiff testified that her medications were helpful and although Plaintiff stated she was not taking physical therapy because it was unhelpful, the record revealed that she had never tried physical therapy. (*Id*.) Further, the ALJ noted Plaintiff's testimony at the September 2012 hearing that, on a typical day, she was able to prepare food, wash clothes, clean her apartment, and sometimes shop. (Tr. 727.) Moreover, Plaintiff had the ability to use a computer to write letters, read newspapers, watch movies, send emails, and place orders. (*Id*.)

The ALJ did not give "controlling weight" to Plaintiff's primary care physician, Dr. Tanner, because many of Dr. Tanner's opinions and diagnoses were not supported by the objective medical evidence in the record and, were at times, inconsistent. (Tr. 733.) Moreover, the ALJ concluded that Dr. Tanner's notes showed that he had "complied with [Plaintiff's] requests" and "continu[ed] the treatment as always" for his own financial interests. (*Id*.) The ALJ also noted that other physicians had indicated that Plaintiff's need for a wheelchair was unclear, and Dr. Tanner himself stated that the need should be reevaluated. (Tr. 733-34.)

The ALJ also found that the opinions of Dr. Keiran, who had completed interrogatories propounded by the ALJ to Dr. Tanner, were not entitled to "significant weight," because Dr. Keiran had never treated Plaintiff and his opinions were based entirely on Bellevue's medical records. (Tr. 734.)

Additionally, the ALJ noted that Dr. Hall's prescription of the wheelchair was based on Plaintiff's own complaints and not on objective data. (*Id*.) Further, the ALJ gave "significant weight" to a physician's April 24, 2000 note, which concluded that Plaintiff did not have cardiac disease, because the opinion "was made by a physician with specific expertise[ ] after objective testing." (Tr. 734–35.) The ALJ also gave "significant weight" to the opinion of Dr. Rocker, a consultative examiner, who reported, based on objective findings, that Plaintiff was able to perform sedentary, light, and moderate work activity. (Tr. 735.) By contrast, the ALJ gave "very little weight" to state agency review consultant Dr. Buonocore's opinion from 2002, that Plaintiff could only stand and walk two hours in an eight-hour day because Dr. Buonocore was a non-treating, non-examining source whose opinion lacked objective support. (*Id*.)

The ALJ emphasized that Plaintiff's claims of disability were "disproportionate" to the record and were not supported by physical examinations or diagnostic testing. (Tr. 736.) He reiterated that Plaintiff's diabetes was described as "'uncomplicated' and under fair control," and that Plaintiff did not display classic manifestations of diabetes. (*Id*.) He noted that multiple physical examinations and diagnostic testing throughout Plaintiff's lengthy medical history were unremarkable, normal, or essentially negative, and that Bellevue physicians noted the possibility of Plaintiff malingering or having Munchausen's syndrome. (*Id*.) The ALJ further noted that Plaintiff's "medical treatment has been conservative," her asthma was frequently recorded as "well-controlled,", and her pulmonary function testing gave "no evidence of obstructive

dysfunction." (*Id.*) The ALJ also noted that, on other occasions, Plaintiff had refused testing to confirm whether she had asthma. (*Id.*) Additionally, the ALJ considered Plaintiff's sinusitis as a "minor illness" which was "entirely self-limiting." (Tr. 737.) He found that Plaintiff's vision difficulties were only temporary, thus, the ALJ concluded that they did not reach Listing-level severity. (*Id.*) The ALJ also considered that there were no objective findings to support a finding of severe lumbago, that Plaintiff's blood pressure had typically been in normal range, and that, even though Plaintiff had at least one ECG consistent with tachycardia, the evidence was not enough to establish heart disease, because her other results were "borderline normal." (Tr. 736−37.)

Based on a review of the record, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, since March 27, 2002, the date the application was filed. (Tr. 739.)

## IV.     ANALYSIS

The Court finds that the ALJ's decision is supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed in its entirety.

### A.     Substantial Evidence Supported the ALJ's Finding that Plaintiff had not Engaged in Substantial Gainful Activity Since the Application Date

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the application date of March 27, 2002. (Tr. 725.) A plaintiff performing substantial gainful work activity cannot be found disabled. 20 C.F.R. § 416.920(a)(4)(i). The ALJ's finding is supported by substantial evidence because the record reflects that Plaintiff has not been employed since January 1, 1996, the alleged onset date. (Tr. 49−50, 97, 723.)

**B.      Substantial Evidence Supported the ALJ's Finding that Plaintiff's Medically Determinable Impairments Were Not Severe**

The ALJ's determination at step two that Plaintiff did not have an impairment or combination of impairments, which significantly limited (or was expected to significantly limit) her ability to perform basic work-related activities for 12 consecutive months is supported by substantial evidence.  (Tr. 725.)   In finding that Plaintiff's combination of impairments was not severe, the ALJ reviewed the record and considered the opinion evidence in the record, affording proper weight to the physicians and the experts.  Indeed, as set forth in detail below, the ALJ conducted a thorough review of Plaintiff's medical history and carefully considered the opinions of the treating, non-treating, consultative physicians, and medical experts, as well as the objective medical evidence, in deciding what weight, if any, to give those opinions.  The ALJ also considered Plaintiff's subjective symptoms and found that Plaintiff's allegations were not supported by the objective medical evidence in the record and, at times, was inconsistent with Plaintiff's own testimony.  (Tr. 725.)

1.      The ALJ Properly Weighed the Opinions of the Plaintiff's Treating and the Consultative Physicians

A treating source's opinion is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with other substantial evidence of record.  20 C.F.R. § 416.927(c)(2).  When determining the weight to give to a treating physician, various factors must be considered to determine how much weight should be given.  *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  "Specifically, the ALJ must consider (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a

specialist; and (v) other relevant factors." *Bailey v. Comm'r of Soc. Sec.*, No. 13−CV−2858, 2016 WL 3962950, at *7 (E.D.N.Y. July 21, 2016) (quoting *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998)) (alterations and internal quotation marks omitted); *see also* 20 C.F.R. §§ 404.1527(c)(2)−(6). Further, the ALJ must give good reasons for the lack of weight given to a treating physician. *See Schaal*, 134 F.3d at 503–04.

(a)      <u>Treating Primary Care Physician Dr. Tanner</u>

The ALJ concluded that Plaintiff's treating primary care physician, Dr. Tanner, was not entitled to controlling weight because Dr. Tanner's opinion lacked support from objective medical evidence and was inconsistent with the record as a whole. (Tr. 733.) The ALJ noted that in 2010, Dr. Tanner opined that he considered Plaintiff to be medically disabled, and asserted that she needed a wheelchair because of lower extremity weakness. (Tr. 733; Tr. 1118.) The ALJ concluded that Dr. Tanner's records did not show objective clinical or diagnostic findings that corroborated his diagnosis of "bilateral lower extremity weakness." (Tr. 733.) The ALJ relied on treatment notes showing that Dr. Tanner, as well as other physicians, frequently reported Plaintiff's ability to transfer from her wheelchair to the examination table without assistance. (Tr. 731–33; Tr. 965−66, 972, 1097.) Further, the ALJ noted that multiple physicians, including Dr. Tanner, at Bellevue, had opined that Plaintiff's need for a wheelchair was unclear, and that Dr. Tanner himself stated that the need should be reevaluated. (Tr. 731, 733−35.) Furthermore, the ALJ noted that although evaluation notes from Bellevue Hospital stated that Plaintiff had neuropathy, the neuropathy diagnosis was not corroborated by positive clinical tests, such MRIs and EMGs. (Tr. 733; Tr. 1147.) He also noted that Plaintiff's own testimony and many physicians' reports indicated that Plaintiff was able to stand and take "a few steps." (Tr. 727, 730–31, 733; Tr. 694.)

With regard to Dr. Tanner's treatment of Plaintiff's asthma, the ALJ noted that Dr. Lin from Bellevue reported that Plaintiff's asthma diagnosis was unclear and that, when Dr. Lin sought to conduct a PFT, Plaintiff became agitated, refused the PFT, and requested treatment by Dr. Tanner. (Tr. 731, 1137.) When Dr. Tanner treated Plaintiff a few months later, he never confirmed the asthma diagnosis with objective testing; he simply reported that her asthma was well-controlled. (Tr. 731.) The ALJ noted that even though "pulmonary function testing showed no evidence of obstructive disease," Dr. Tanner continued treating Plaintiff for asthma. (Tr. 731, 733; Tr. 1134.) Moreover, the ALJ noted that other medical doctors at Bellevue noted "there was no clear reason . . . for a diagnosis of asthma." (Tr. 733; Tr. 1136−37.) The ALJ sought to receive clarification about Plaintiff's diagnoses from Dr. Tanner by sending interrogatories to him. (Tr. 1151.) Dr. Tanner did not respond to the ALJ's interrogatories, however; Dr. Keiran, a non-treating physician completed them instead. (*Id.*)

Medical sources are given more weight upon presentation of relevant medical evidence supporting their opinion. 20 C.F.R. § 416.927(c)(3). Though Dr. Tanner was Plaintiff's primary medical doctor for many years, the Court finds the ALJ's determination that Dr. Tanner's opinion was inconsistent with the objective evidence in the record was sound, and is supported by the record before the Court. Accordingly, the Court finds that the ALJ provided "good reasons" for not giving controlling or significant weight to Dr. Tanner's opinion. *See Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (ALJ demonstrates "good reason" for giving little weight to the opinion of a treating physician where the opinion is inconsistent with the source's own treatment notes); *Legg v. Colvin*, 574 F. App'x 48, 49 (2d Cir. 2014); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (holding that "the less consistent [a doctor's] opinion is with the record as a whole, the less weight it is given").

(b)  Non-Treating Physician Dr. Kieran

The ALJ also did not give significant weight to Dr. Keiran's opinions, as set forth in the responses to the ALJ's interrogatories that were intended for Dr. Tanner, about Plaintiff's limitations, because Dr. Keiran had not treated Plaintiff and had only provided his opinion based on a review of records, without specifying the particular records reviewed.  (Tr. 734.)  The Court finds that the ALJ was proper in not affording significant weight to Dr. Keiran's opinion because he was a non-examining, non-treating physician with no specialization and little understanding of the agency's disability programs.  *See* 20 C.F.R. § 416.927(c).  Furthermore, to the extent that Dr. Kiernan relied on Dr. Tanner's treatment records, Dr. Kiernan's opinions suffered from the same ambiguities and deficiencies as Dr. Tanner's opinions, which the interrogatories were actually intended to clarify or resolve, if possible.

(c)  State Agency Review Consultant Dr. Buonocore

The ALJ assigned "very little weight" to state agency review consultant Dr. Buonocore's opinion that Plaintiff could stand and walk two hours in an eight-hour day and carry and/or lift ten pounds occasionally, because Dr. Buonocore was a non-treating, non-examining source, and his opinion lacked objective support.  (Tr. 735.)  Indeed, Dr. Buonocore's finding that Plaintiff could stand and walk for two hours in an eight-hour day is not supported by any medical evidence in the record.  (*Id.*)  Accordingly, the Court finds that the minimal weight afforded to Dr. Buonocore's opinion was proper.  *See* 20 C.F.R. § 416.927(c).

(d)  Consultative Examiner Dr. Rocker

With regard to the opinion of consultative examiner, Dr. Rocker, the Court finds that the ALJ properly gave Dr. Rocker's opinion significant weight.  (Tr. 735.)  Dr. Rocker opined that Plaintiff was able to perform sedentary, light, and moderate work activity.  (*Id.*)  As the ALJ found,

Dr. Rocker's opinion was consistent with Plaintiff's normal neurological examinations and the absence of any objective testing showing any functional limitations. (*Id.*) The ALJ reasoned that Dr. Rocker's opinion was deserving of significant weight because Dr. Rocker examined the patient and his findings were consistent with the objective medical evidence in the record. The Court finds that the weight afforded to Dr. Rocker's opinion was properly based on its consistency with the medical evidence and Dr. Rocker's greater understanding of the disability programs and their evidentiary requirements. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion."); *Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014) (ALJ properly relied on consultative examiner's evaluation to reject treating physician's opinion where the treating physician's opinion was inconsistent with other substantial evidence in the record); *Parker v. Berryhill*, No. 15-CV-342, 2017 WL 1196470, at *3 (W.D.N.Y. Mar. 31, 2017) (stating that familiarity with SSA rules and regulations was a proper reason to afford more weight to a consultative examiner); *Rivera v. Colvin*, No. 15-CV-3857, 2015 WL 9591539, at *16 (S.D.N.Y. Dec. 18, 2015) ("An ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence.").

(e)     Consultative Medical Expert Dr. Greenberg

Similarly, the Court agrees with the ALJ's reasoning in giving significant weight to the opinion of independent medical expert, Dr. Greenberg, a Pulmonary Disease Specialist. (Tr. 735; Tr. 820−24.) Dr. Greenberg opined that Plaintiff had no impairment that met or was medically equal to a Listing. Dr. Greenberg noted the following in supporting his opinion: (1) the inability to identify a cause of Plaintiff's pain symptoms; (2) the absence of any diagnosis or other objective

factor accounting for Plaintiff's need for a wheelchair; (3) Plaintiff's well-controlled asthma; (4) Plaintiff's normal stress test results; and (5) the lack of evidence confirming cardiac disease. (Tr. 735; Tr. 1255−68.) The ALJ gave significant weight to Dr. Greenberg's opinion because "Dr. Greenberg [had] appropriate expertise, and [had] reviewed claimant's record and heard her testimony; furthermore, he [was] familiar with Social Security Regulations and the opinion is consistent with the record." (Tr. 735) The Court finds that the weight afforded to Dr. Greenberg's opinion was proper. *See* 20 C.F.R. § 416.927(c)(6) ("[T]he amount of understanding of our disability programs and their evidentiary requirements that a medical source has . . . and the extent to which a medical source is familiar with the other information in [Plaintiff's] case record are relevant factors that [the ALJ] will consider in deciding the weight to give to a medical opinion."); *Selian*, 708 F.3d at 418 ("[T]o override the opinion of [a] treating physician . . . the ALJ must explicitly consider whether the physician is a specialist."); *Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) ("[N]oting that the applicable regulations 'permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record.'" (quoting *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995))); *LaClair v. Colvin*, No. 6:12-CV-816, 2013 WL 5218067, at *2 n.4 (N.D.N.Y. Sept. 16, 2013) (finding that an ALJ properly considered the expert's knowledge of the SSA's disability programs when determining the amount of weight to accord the expert's opinion).

(f)     Treating Physician Dr. Hall

While the ALJ gave no weight to Dr. Hall's treatment notes, because they were inconsistent with his subsequent interrogatory responses and not supported by objective evidence in the record, the ALJ accorded significant weight to Dr. Hall's interrogatory responses dated March 20, 2013,

which the ALJ found were supported by objective evidence in the record. (Tr. 738; Tr. 1181–82.) The Court finds that the ALJ's consideration and weighing of Dr. Hall's opinions was proper.

Dr. Hall treated Plaintiff for a significant period prior to the relevant period. [39] (Tr. 738); *see Frye ex rel. A.O.*, 485 F. App'x. at 485 n.1 (relevant time period is date the SSI application was filed to date of ALJ's decision). The ALJ noted that although Dr. Hall indicated in his treatment notes that Plaintiff needed a wheelchair, that opinion was not supported by examination findings. (Tr. 738.) In response to the ALJ's interrogatories, Dr. Hall indicated that Plaintiff had not been evaluated by a neurologist or other medical professional regarding her need for a wheelchair. (Tr. 738; Tr. 1181.) The ALJ further noted that, Dr. Hall indicated that he had not reported in his treatment record for Plaintiff any diagnostic evidence supporting a need for a wheelchair, but had instead based his opinion primarily on one ECG test that showed tachycardia, though other tests were normal or borderline normal.[40] (*Id.*) Dr. Hall also indicated that no pulmonary function testing was done to support his diagnosis of asthma, nor was any objective testing done to support the diagnosis of a heart condition. (*Id.*)

The Court finds that the ALJ allocated the proper weight to Dr. Hall's treatment notes (*i.e.*, none) and his interrogatory subsequent responses (*i.e.*, significant), given that Dr. Hall's treatment notes were inconsistent with his interrogatory answers and unsupported by the objective medical

---

[39] The Court notes that Plaintiff was examined by neurologist, Dr. Gao, during 2001, prior to the relevant period. (Tr. 1164.) Though he prescribed Plaintiff's wheelchair, the record shows that Dr. Gao discharged Plaintiff from the Neurology Clinic after a negative work-up, including a negative MRI and a negative EMG. (Tr. 261); *see Monette*, 269 F. App'x. at 113 (treating physician rule does not technically apply when claimant was not treated during relevant period); *Blanda*, 2008 WL 2371419, at *13 (noting that a physician's opinion was "not entitled to controlling weight as he was not a treating physician during the period in contention")).

[40] Dr. Hall also based his opinion on Plaintiff's subjective complaints of palpitation, shortness of breath, leg cramping and fatigue. (Tr. 1181.) These complaints, however, were not supported by objective evidence in his record.

evidence, whereas, his interrogatory responses were consistent with the objective medical evidence. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion."). Further, it was not erroneous for the ALJ to give significant weight to Dr. Hall's interrogatory responses, even though Dr. Hall treated Plaintiff outside the relevant period. *See Monette v. Astrue*, 269 F. App'x. 109, 113 (2d Cir. 2008) (summary order) (noting that treating physician rule does not technically apply when physician did not treat claimant during the relevant period; however, the opinion of a physician who treated claimant outside the relevant period may still be given significant weight); *Rogers v. Astrue*, 895 F. Supp. 2d 541, 550 (S.D.N.Y. 2012) (finding physician's opinion was entitled to significant weight even though physician treated plaintiff outside the relevant period, where physician treated plaintiff for several months and his notes frequently referenced the symptoms at issue).

(g)     Dr. Oppenheimer[41]

The ALJ properly gave significant weight to Dr. Oppenheimer's specialized opinion that was based on a 2D Echo and ECG indicating that there was no evidence of ischemia or cardiac disease. (Tr. 733−34; Tr. 639); *see Petrie v. Astrue*, 412 F. App'x. 401, 407 (2d Cir. 2011) ("The regulations provide that an opinion of a specialist regarding medical issues related to his or her area of specialty must be given more weight than the opinion of a source who is not a specialist."); *Rodriguez v. Barnhart*, No. 04-CV-949, 2004 WL 2997876, at *9 (S.D.N.Y. Dec. 28, 2004)

---

[41] Although Dr. Oppenheimer would ordinarily qualify as a treating physician, because he treated Plaintiff outside the relevant period, the treating physician rule does not apply to him. *See Monette*, 269 F. App'x. at 113 (noting that treating physician rule does not technically apply to physician who did not treat claimant during the relevant period). Nonetheless, the ALJ was entitled to give significant weight to Dr. Oppenheimer's opinion. *Id.* (opinion of physician who treated claimant outside the relevant period may still be given significant weight).

("Generally, an ALJ should give the opinion of . . . a specialist additional weight."). Like Dr. Hall, the ALJ gave proper weight to the opinion of Dr. Oppenheimer because, although Dr. Oppenheimer treated Plaintiff outside the relevant period, his opinion addressed one of Plaintiff's alleged symptoms that is at issue and that was referenced frequently throughout the record in this case. *See Monette*, 269 F. App'x. at 113; *see also Rogers*, 895 F. Supp. at 550.

(h)     Dr. Christina Tan

Similarly, the ALJ did not give any weight to Dr. Christina Tan's August 20, 1998 opinion that Plaintiff "had been disabled since 1996" because it was not supported by objective medical evidence, as discussed herein, and because the opinion was made well before the relevant period. (Tr. 728); *see Monette*, 269 F. App'x. at 113 (treating physician rule does not technically apply when claimant was not treated during relevant period); *Blanda v. Astrue*, No. 05-CV-5723, 2008 WL 2371419, at *13 (E.D.N.Y. June 9, 2008) (noting that a physician's opinion was "not entitled to controlling weight as he was not a treating physician during the period in contention")). Despite opining that Plaintiff was permanently disabled as of 1996, none of the tests administered by Dr. Tan or her medical findings support this conclusion. (*See, e.g.,* Tr. 453 (April 1998 exam showed no palpable masses in neck and head area); Tr. 1149–50 (July 1998 ultrasound showed no significant changes from Plaintiff's ultrasound a year earlier); Tr. 411 (September 1998 PFT showed no obstructed airway); Tr. 399, 401, 409 (December 1998 and March 1999 exams showed that Plaintiff's lungs were clear); Tr. 403 (February 1999 exam showed stable pulmonary function; July 1999 ECG was normal).) Moreover, the ultimate disability determination is reserved for the Commissioner. 20 C.F.R. § 404.927(d)(2); *see also Snell*, 177 F.3d at 133 ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to

whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative.").

(i)     <u>Dr. X. Gao</u>

The ALJ did not address Dr. Gao's 2001 opinions, and was not required to do so as it was outside the relevant period. *See Monette*, 269 F. App'x. at 113 (treating physician rule does not technically apply when claimant was not treated during relevant period). The ALJ did consider, however, Dr. Gao's 2014 opinions as evidenced in Plaintiff's Physician's order for a wheelchair. (*see* Tr. 735–36.) The ALJ noted that Dr. Gao reported that Plaintiff had neck and low back pain as well as leg weakness from neuropathy; he also noted that the only positive findings were 4/5 strength in the hips, knees and feet. (*Id.*) The ALJ did not give Dr. Gao's 2014 opinion controlling weight because it was not supported by the other evidence in the record. (*Id.*) Accordingly, the Court finds that the ALJ afforded proper weight to the opinions of all of the doctors who treated, examined, or rendered opinions about Plaintiff.

2.     <u>The ALJ Properly Evaluated Plaintiff's Subjective Symptoms</u>

After considering the evidence in the record, the ALJ found that Plaintiff had no medically determinable impairments that could reasonably be expected to produce her alleged symptoms, and that there was no objective corroborative evidence supporting Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms. (Tr. 736.) The ALJ's findings about Plaintiff's subjective symptoms are supported by substantial evidence.

"When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that 'decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.'" *Frazier v. Comm'r of Soc. Sec.*, No. 16-CV-4320, 2017 WL

1422465, at *11 (S.D.N.Y. Apr. 20, 2017) (quoting SSR 16-3p, 2016 WL 1119029, at *9 (Mar. 16, 2016)).  ALJs must use a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged . . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quotations, citations and brackets omitted) (citing 20 C.F.R. §§ 404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p); *see also* SSR 16-3p, 2016 WL 1119029, at *2; *Burgess v. Colvin*, 15-CV-9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016) (quoting SSR 16-3p for an explanation of the two-step process for assessing claimants' statements about their symptoms).  An evaluation of a claimant's subjective symptoms is not an evaluation of the claimant's character.  *See Burgess*, 2016 WL 7339925, at *15 n.2 (citing SSR 16−3p[42] ("[S]ubjective symptom evaluation is not an examination of an individual's character.")).

Here, the ALJ properly applied the two-step process, and substantial evidence supported his determination that Plaintiff's allegations were disproportionate to the record and were not

---

[42] SSR 16-3p superseded SSR 96-7p and provided updated guidance on evaluating a claimant's subjective symptoms and their impact on the claimant's ability to perform work. *Frazier*, 2017 WL 1422465, at *11 (citing SSR 16-3p, 2016 WL 1119029).  SSR 16-3p espouses a more holistic analysis of the claimant's symptoms, and "eliminate[s] the use of the term 'credibility'" from sub-regulation policy.  SSR 16-3P, 2016 WL 1119029, at *1.

supported by the medical evidence. (Tr. 736.) First, the ALJ reviewed the evidence for each of Plaintiff's medically determinable conditions and found that each of the conditions was either "well-controlled," a minor condition that did not affect her functional ability, or unsupported entirely by the medical evidence. (*See* Tr. 736–38.) The ALJ determined that Plaintiff had the following medically determinable impairments: diabetes mellitus, hypertension, asthma, sinusitis, reflux esophagitis, tachycardia, a small calcaneal enthesophyte, allergies, pruritus[43], neuropathy, a history of cataract surgeries, and a history of thyroidectomy. (Tr. 725.) The ALJ found that none of these impairments or combination of impairments significantly limited (or was expected to significantly limit) Plaintiff's ability to perform basic work-related activity for a 12-month period. (*Id.*)

The ALJ considered the fact that during the relevant period, Plaintiff's diabetes was reported as "well-controlled" on most occasions after the initial diagnosis. (Tr. 736; Tr. 170, 174−175, 959−60, 1162.) The ALJ also noted Dr. Rocker's report that Plaintiff did not experience common symptoms of diabetes such as polyphagia, polyuria,[44] or polydipsia. (Tr. 736; Tr. 252.) The ALJ also remarked that Plaintiff's blood pressure levels were typically within normal range, suggesting that any hypertension was benign. (Tr. 736; Tr. 228, 969, 972, 1097, 1162.) With regard to the Plaintiff's asthma, the ALJ noted that it was consistently described as "stable" and "well-controlled" and her pulmonary function testing gave "no evidence of obstructive dysfunction." (Tr. 736; Tr. 283, 465, 963.) He also noted that after a Bellevue physician indicated

---

[43] Pruritus is usually caused by dry skin, which results in an uncomfortable and irritating sensation. *Itchy skin (pruritus)*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/itchy-skin/home/ovc-20262856 (last visited Sept. 18, 2017).

[44] Plaintiff, however, did report a frequent urge to urinate, which is a common symptom of polyuria. (Tr. 1202.)

that it was unclear whether Plaintiff had asthma, Plaintiff refused testing on multiple occasions to confirm her asthma diagnosis. (Tr. 736; Tr. 466, 453, 459.) While Plaintiff frequently complained of "cold−like symptoms" that were diagnosed as sinusitis, the ALJ noted that this was a minor condition. (Tr. 737; Tr. 156, 963.) Similarly, the ALJ noted that Plaintiff's pruritis diagnosis was minor and entirely self-limiting. (Tr. 737.) Additionally, the ALJ determined that Plaintiff's reflux esophagitis is a non−severe illness for which the record contained "no evidence of any complications or functional restrictions." (*Id.*) He also noted that Plaintiff had a single ECG that was consistent with tachycardia, but her results were otherwise "borderline normal;" other diagnostic exams revealed no cardiac disease. (*Id.*; Tr. 639, 1266.)

The ALJ noted that Plaintiff's enthesopathy of the ankle and tarsus was described as "mild pain on palpation" and did not result in "loss of power, sensation, reflex, or gait abnormality." (Tr. 737; Tr. 971.) Further, he noted that Plaintiff was successfully treated for the condition with Lidocaine injections. (Tr. 737; Tr. 992, 1071.) With respect to her eyesight, the ALJ noted that Plaintiff underwent two successful cataract surgeries that resulted in 20/20 vision bilaterally. (Tr. 737; Tr. 1085−86, 1092, 1103.) Thus, he concluded that any vision difficulties were only temporary and did not meet Listing-level severity. (Tr. 737) Further, the ALJ stated that Plaintiff's treatment "has been conservative" as she has not had any serious hospitalizations since 1996 other than her two successful cataract surgeries. (Tr. 737); *Mollo v. Barnhart*, 305 F. Supp. 2d 252, 264 (E.D.N.Y 2004) (noting that "the ALJ's decision to discount the plaintiff's subjective complaints of pain [was] supported by substantial evidence" because of, among other factors, "the 'conservative' nature of [claimant]'s treatment"). The ALJ also noted that between January 2003

and March 2004, Plaintiff presented to the clinic only for prescription refills. (Tr. 730; *see* Tr. 1137, 1146.)[45]

With regard to Plaintiff's neurological condition, the ALJ referenced Plaintiff's own testimony that she was able to stand and take a few steps, despite claims of wheelchair dependency. (Tr. 727; Tr. 65.) The ALJ noted Dr. Buonocore's communication with neurologist Dr. Gao, in which Dr. Gao stated that Plaintiff's neurological assessment was negative. (Tr. 735; Tr. 249.) Moreover, in multiple examinations both before and after the application date, Plaintiff was described as neurologically normal. (Tr. 728–36; Tr. 168, 214, 261, 992, 1147.) The ALJ noted that in 2000, Dr. Hall stated that he had prescribed Plaintiff's wheelchair for heart palpitations, shortness of breath, leg cramp, and fatigue when walking on foot. (Tr. 729; Tr. 156.) Yet, in 2011, Dr. Tanner stated that Plaintiff was confined to a wheelchair due to "leg weakness." (Tr. 733; Tr. 997.) Further, the ALJ noted that multiple physicians at Bellevue, including Dr. Tanner, opined that Plaintiff's need for a wheelchair was unclear. (Tr. 731, 735; Tr. 228.)

Finally, by February 2014, Dr. Gao noted only slightly reduced strength of 4/5 in both of Plaintiff's lower extremities. (Tr. 891.) Although Dr. Gao asserted in that report that Plaintiff had been diagnosed with peripheral neuropathy for over ten years (Tr. 884, 891), and physician's assistant Mr. Wong stated in August 2014 that Plaintiff had diabetic neuropathy or neuralgia pain

---

[45] The Court notes that Plaintiff's medical record also reflects that between June 2007 and March 2009, she did not seek medical care of any kind, a nearly two-year gap without treatment or prescription refills. (Tr. 1160.) *See Vered v. Colvin*, No. 14-CV-4590, 2017 WL 639245, at *16 (E.D.N.Y. Feb. 16, 2017) (citing S.S.R. 16-3P, 2016 WL 1119029, at *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.")).

since 2000 (Tr. 898–99), these assertions are in contravention by the medical evidence from the prior ten years, which generally indicated only "possible" peripheral neuropathy. (*See* Tr. 253, 982.) Similarly, the ALJ noted that Plaintiff usually reported no pain issues to her treating providers (Tr. 731–32; *see, e.g.*, Tr. 961, 962, 969, 972, 981−82, 1097, 1132, 1134, 1197), and she testified at the August 2015 hearing that she did not have any pain in her legs. (Tr. 1199–1200, 1203.) Accordingly, substantial evidence supports the ALJ's finding that neuropathy did not constitute a severe impairment.

Additionally, the ALJ determined that many of Plaintiff's conditions occurred intermittently over time in Plaintiff's vast medical record or were one-time conditions now resolved. (Tr. 728, 737.)

"Because [Plaintiff's subjective] symptoms suggest a greater impairment than can be shown by objective evidence, the ALJ [was] entitled to consider [her] daily activities." *Miller v. Astrue*, No. 12-CV-3709, 2013 WL 5614114, at *12 (S.D.N.Y. Aug. 30, 2013). The ALJ considered Plaintiff's daily activities, and noted that she was able to prepare food, wash clothes, clean her apartment, shop, watch television, use a computer, read a newspaper, and make clothes with a foot-operated sewing machine, among other things. (Tr. 727.) The ALJ also noted that Plaintiff lived alone and traveled on public transportation alone to attend welfare appointments, and to shop at the supermarket and pharmacy. (*Id.*) He further noted that although Plaintiff stated that she was not doing physical therapy because it was not helping her, the record indicated that Plaintiff never had any physical therapy. (Tr. 726); *see* 20 C.F.R. § 416.929(c)(3)(v) (stating that ALJs may consider whether Plaintiff received treatment other than medication). The ALJ emphasized Plaintiff's own testimony regarding her functional capacity in which she stated she could walk a few steps, stand ten to twenty minutes at a time, sit for one to two hours, and lift

about twenty pounds with both hands. (Tr. 727.) He also noted that Plaintiff testified, before ALJ Strauss in 2015, that she could sit for several hours. (*Id.*) Lastly, the ALJ considered that Plaintiff had refused to undergo scheduled consultative examinations, which he noted made evaluating Plaintiff's symptoms more difficult. (Tr. 738.) He determined that Plaintiff's refusal to undergo the scheduled consultative examinations further discredited Plaintiff's claim that she had a medical need for a wheelchair because this need was not otherwise evidenced in the record. (*Id.*)

The ALJ provided a multitude of specific reasons supporting his determination that the intensity, persistence, and limiting effects of Plaintiff's symptoms were not consistent with the other evidence in the record, which this Court finds to be supported by substantial evidence in the record. Accordingly, the Court finds that the ALJ's conclusion that Plaintiff's impairments did not prevent her from performing light and sedentary work activities and, as such, were not severe, was supported by substantial evidence in the record. *See Faucette v. Comm'r of Soc. Sec.*, No. 13-CV-4851, 2015 WL 5773565, at *12 (S.D.N.Y. Sept. 30, 2015) ("A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, . . . do not have more than a minimal effect on the person's physical or mental [abilities] to perform basic work activities."). Thus, the ALJ properly found that Plaintiff was not disabled, thereby denying the claim at step two. *See McManus v. Comm'r of Soc. Sec.*, 298 F. App'x. 60, 61 (2d Cir. 2008) (affirming the ALJ's decision to "den[y] [claimant]'s application for benefits at step two of the Commissioner's five-step sequential review process" because the ALJ's determination that the claimant's impairments "were not 'severe' impairments within the meaning of the Social Security scheme" was supported by substantial evidence (internal citations omitted)).

## CONCLUSION

For the reasons set forth above, the Court finds that the ALJ applied the proper legal standards and his findings are supported by substantial evidence in record.  Accordingly, the Court GRANTS the Commissioner's motion for judgment on the pleadings and DENIES Plaintiff's cross-motion.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

_/s/ Pamela K. Chen_
Pamela K. Chen
United States District Judge

Dated: September 29, 2017
      Brooklyn, New York